| 18 | 307 |
| Case 1 | |
| 48 | 489 |

| 18 | 307 |
| Case 1 | |
| 43 | 32 |

[Filed January 6, 1890.]

JENNIE LANGFORD, Respondent, v. HENRY JONES, Appellant.

Malpractice—Reasonable Learning and Skill.—In the trial of an action against a physician and surgeon for alleged unskillfulness and negligence in the treatment of a special case of sickness or infirmity which he is employed to attend, a liability cannot be established against him in consequence of his failure to learn the peculiar condition of the patient in another respect, unless the evidence clearly shows that he does not possess such a reasonable degree of learning and skill as is requisite for the practice of his profession, or that he did not exercise his best judgment and ordinary care and diligence to discover whether such condition existed or not. And where, in such a case, it appeared that there was good reason for believing that such condition did not exist, and that the physician applied all the tests known to medical science which could be employed under the circumstances of the case to ascertain such fact, and was unable to detect it, *held*, that a cause of

action against him, on account of such failure, was not made out, and that a non-suit, if properly applied for, should have been granted.

WITNESS IMPEACHMENT.—The provision of the Civil Code of this State which authorizes the party producing a witness to contradict him by other evidence, and to show that the witness has made at other times statements inconsistent with his present testimony, does not entitle the party producing the witness to inquire of him as to his having made statements at other times which are not connected with his present testimony, nor to inquire about his having made statements at other times regarding matters upon which he is examined, but concerning which he denies any knowledge, except for the purpose of refreshing the witness's recollection as to such matters. Said provision of the Code was not intended to allow the party to prove matters favorable to his side of the case by the unsworn statements of persons not parties to the action, but to prevent him from being bound by testimony against him given by his own witness—that is, it enables the party in such case to weaken the force of such testimony by impeaching the witness in the manner specified in the provision.

EXPERT EVIDENCE—EFFECT OF.—The opinions of experts as evidence upon questions of medical science or treatment, although based upon hypothetical statements of fact, are entitled to the same consideration as other direct oral testimony, when such statements are found to be real. Then the facts cease to be hypothetical, and for the purposes of the case become fixed and certain.

INSTRUCTIONS—ABSTRACT PROPOSITIONS OF LAW.—An instruction given by a trial court to a jury as to the law to be applied in case they found certain facts, where there was no evidence in the case which would justify such a finding, *held,* to be irrelevant and erroneous.

EXCEPTION TO PART OF INSTRUCTION—MANNER OF TAKING.—An exception to an instruction given by a trial court to a jury, where the exception is only to a part of the instruction, must specify the particular portion of the instruction excepted to, otherwise an appellate court will not consider it.

APPEAL from a judgment of the circuit court for the county of Multnomah, entered upon the verdict of a jury.

The respondent commenced an action against the appellant in said circuit court to recover damages for alleged malpractice as a surgeon and physician. The complaint contains the usual allegations of negligence and unskillfulness charged in such cases, which are denied in the answer, and the denials followed by a statement claimed to be the facts concerning the affair. This statement was treated as new matter and denied in the reply. The case was tried by a jury, who returned a verdict for the respondent in the sum of one thousand dollars, upon which the judgment appealed from was entered. The appellant seeks to have this judgment reversed, upon exceptions taken at the trial, which are shown in the opinion of the court as far as necessary to an understanding of the case

*Geo. H. Williams,* for Appellant.

*Alfred F. Sears, Jr.,* for Respondent.

THAYER, C. J.—The grounds upon which the appellant claims a reversal of the judgment appealed from are mainly that the circuit court erred in its refusal to non-suit the respondent upon motion of appellant's counsel, made at the trial; that it erred in permitting the respondent's counsel to inquire of their own witness, Dr. W. E. Rinehart, at the trial, if, at a certain time and place, in the presence of J. V. Bridges and wife, he did not say, in reference to an operation performed by appellant upon respondent, in which a growth had been removed from the neck of the womb, "It was a bad job. Mrs. Langford had no cancer; it was a growth on the womb, prevalent in the case of pregnant women, and she could have been operated upon on his table in the doctor's office for a small fee, and have gone about her business at once," or words to that effect, and in allowing the testimony of said witness to be contradicted upon that point, and the said J. V. Bridges to testify that the witness made such statement. And that the court also erred in giving certain instructions to the jury, which are hereafter more particularly referred to. The first and most important question to be considered is the one arising upon the motion for a non-suit.

It appears from the pleadings in the case, and the bill of exceptions contained in the transcript, that the respondent, on the twenty-second day of November, 1887, applied to appellant as a surgeon and physician for medical treatment. The respondent was a married lady, was the wife of Mr. George Langford, who has been a resident of the city of Portland for a number of years past; that she had given birth to three children, two of whom were then living, and she had also had two miscarriages. It appears that she had been suffering more or less for a long time from an affection of the womb; that the neck of it had been lacerated in giving birth to her eldest child, a boy, who at the time of her application to the appellant for treatment was about sixteen years of age; that the difficulty at times had occasioned excessive hemorrhage, and been a source of great annoyance and suffering; that some six or seven

years prior to her application to the appellant she had been treated by another physician, Mrs. Dr. Owens Adair, for some trouble of the stomach; that said physician examined her, and, as she testified upon the trial, found a lacerated and torn condition of the neck of the womb, presenting what doctors call a granulated surface, which looked raw and sore. The witness testified: "I treated that, and found that she had repeated hemorrhages. I do not remember that they occurred excepting at her regular periods of menstruation. I treated her for that. I do not remember that I gave her any medicine for it, but I do remember that I considered it due to some enlarged condition of the body of the womb, and applied tincture of iodine on what we call an applicator, and that month she missed her regular flow, and improved very rapidly from not having lost any blood. The next month she had her regular menstrual flow, and considered herself well, and that is the last I ever knew of Mrs. Langford, professionally."

Another physician, Mrs. Dr. Hunt, had treated respondent from February, 1887, until in April of that year, and had called in as consultant Dr. Kenneth McKenzie. Mrs. Dr. Hunt testified as a witness upon the stand that the respondent came to her office in February, 1887, complaining of frequent, irregular, profuse hemorrhage, exhaustion and pain, and that she found, upon a digital examination, a growth on the side of the uterus about the size of a dollar; that the most gentle touch of it gave pain and caused great hemorrhage, so much so that it filled the witness's hand and ran down her arm when she made the examination; that she called in counsel, at the request of the respondent, to know whether it was really malignant growth or benign growth, and with a view to an operation; that respondent was twice in her office, once the last of March, and once, she thought, about the seventh or eighth of April; that they gave her an anæsthetic and removed a small piece of the growth, which was sent to Dr. Kelley for microscopical examination; that they found one-third

of the posterior lip of the uterus, and involving the anterior also somewhat, with that papular mass, dark colored, a sort of blue, red bluish color, then a lighter yellowish tint; that she had heard the testimony of Dr. Jones and Mrs. Young, and taking into consideration their testimony upon the subject, and what she knew personally of the condition of the disease, she was of the opinion that it was cancerous; that she told respondent the same and advised an operation as soon as possible; that the respondent came to her office making ready to go East; that it was the great hemorrhage which gave her alarm; that all witness was trying to do was to relieve and check that, so that respondent might go East and there have an operation performed; that witness gave that advice to her and to her husband.

Dr. McKenzie, the consultant with Mrs. Dr. Hunt, gave testimony as a witness in the case which fully corroborated the testimony of the latter in regard to the condition of the respondent and the extent and severity of her affliction at the time. He testified: "We made a careful examination and found a large excrescence, or growth, projecting from the posterior lip of the womb, the surface of which was soft and friable, readily broken down, and bled at the slightest touch." This seems to have been the condition the respondent was in six months prior to her application to appellant for treatment, and, in all human probability, the disease had made alarming progress during that time, although the respondent appears to have been inclined to represent her general health as favorable as possible. The tumor, however, was there, still developing and exhibiting more marked indications that it was of a malignant type. The respondent testified that the appellant, when he examined her, pronounced it a cancer, and said that an operation was necessary, and the sooner performed the better.

The appellant himself testified that she then looked weak and feeble, was short of breath, complained of pains at the lower part of the abdomen, of tenderness when she

stepped down or up quickly, or received a jar or rub; that
on coming up stairs was easily tired out and palpitation of
the heart ensued; that frequent hemorrhages had occurred
for a year and a half or two years, irregular and profuse,
so much so that at times she had fainted from loss of
blood, and that she had been in her bed nearly ten days
before coming to see appellant.    Upon the following day
the appellant made a digital examination and found, as he
testified, a tumor, which came within an inch of the sur-
face, completely filling the cavity of the vagina, but could
not determine by touch its attachments; that it filled up
the whole back part of the vagina to the back and to her
right side; that within a few days thereafter he removed
it, and found that it was a large papular outgrowth spring-
ing from the neck of the uterus, and the diseased surface
was well marked.    Portions of it were of a yellowish tint,
others more of a yellowish red or pinkish; that it bled
profusely by simply introducing the speculum; that it was
the size of a good-sized orange; was not round like an
orange, but was soft and papular and adapted itself to the
sack or tube; and that in removing it he removed a part of
the neck of the uterus.

Down to this point in the history of the case, as shown
by the testimony, there is no proof whatever which would
authorize a recovery in favor of the respondent.    There
can not be even a pretense that the appellant thus far, in
his treatment of the respondent, in any particular neg-
lected his duty.    That the respondent was seriously ill
there can be no doubt, and her disease was of a character
which demanded prompt and skillful attention.    It was
making progress and would soon undermine her constitu-
tion, if it had not already done so.    The removal of
the tumor was skillfully and successfully accomplished,
and the parts affected in consequence thereof properly
adjusted and treated.    Nor can it be maintained that
the appellant was guilty of any neglect of duty after the
performance of the operation, so far as concerned his
ostensible employment.    He attended strictly to all the

incidental matters, carefully removed the sutures which he had inserted, endeavored to alleviate pain, and diligently observed and assisted the healing process as it advanced.

A competent and experienced surgeon so thoroughly appreciates the responsibility of his position that he would hardly be expected, in a critical case, to neglect affairs of vital importance. Besides, those who practice that profession are not devoid of the kindly sympathy for the unfortunate which is possessed by other people, nor of an unselfish desire to relieve human suffering and distress, as many would seem to suppose. They undoubtedly labor under more mental anxiety by far than any other class, and their ambition to maintain a fair fame and reputation are powerful incentives to fidelity in the discharge of such sacred trusts as are committed to their care. I have not the most remote idea that out of the whole list of names of the prominent physicians called as witnesses upon the trial of this case one would be found whose constancy to professional duties can justly be suspected, or who, under any consideration, would neglect them, where the consequences would be likely to result seriously. This confidence does not arise from faith in the superior integrity of the medical profession; but there is an innate desire in all mankind for success, approbation and fame, and, when encouraged by such a training as is usually given in medical schools, it becomes the predominant sentiment of the mind, and very few are so dull or stupid as not to be actuated by its influence, or to believe that it can be realized in any other way than by the exercise of active vigilance and unremitting attention.

The respondent's counsel did not claim, however, at the hearing, that the appellant was negligent in the respect above alluded to; but insisted that he was negligent in failing to discover the existence of the respondent's pregnancy until after the expulsion of the fœtus, and that her condition was evident; also that he negligently and unskillfully probed the uterine cavity with a metal instrument, whereby he ruptured the fœtal membrane and tore

the placenta, on account of which the fœtus died; that he negligently inserted his finger in the uterine cavity and caused needless pain and suffering, and hastened the death of the fœtus; and that he negligently suffered the dead fœtus to remain in the respondent's body, and administered drugs and medicines which retarded delivery after labor pains had commenced. That the appellant failed to discover the pregnancy of the respondent, he does not deny; but that her condition in that respect was evident, he does deny, and denies also all the alleged acts of negligence and unskillfulness above referred to; and he can not be justly · chargeable with any negligence or unskillfulness on account of said matters, unless it is shown that the respondent's condition of pregnancy was so apparent that it could have been detected by the exercise of reasonable judgment and intelligence and ordinary diligence on his part. Without such a showing he is not liable to any such imputation, even though he had done all of said acts.

The appellant was employed to treat the respondent for a malady of the most alarming character. It was apparently local, but most probably the origin of numerous ailments, and was of such a nature that unless arrested her life was but a burden, and its continuance for a brief period could be no more than a miserable existence. Its prolongation would be attended with excruciating pain suffering and distress, and necessarily be brought to a speedy close. It was in that condition the appellant found her, and he viewed her case from that standpoint. The question of her pregnancy was only a secondary matter, and his treatment would not have been varied if he had known it, unless he did probe the uterine cavity, as the respondent's counsel allege, but which he emphatically denied upon his oath, administered to him on the witness stand. In view of the character of the respondent's sickness when she applied to the appellant for treatment, what earthly reason could he have had, after learning the history of her case, for surmising that she might be pregnant? The tumor with which she was afflicted had doubt-

less been developing for a long time; it was of the size of a dollar in the previous April, when Mrs. Dr. Hunt examined it, and then caused profuse hemorrhage from the slightest touch, and was extremely sensitive to pain. That was more than seven months before her application to the appellant for treatment in November, and we must presume that during that interval the disease had become more aggravated; yet it must have been within that period of time that she conceived. How could the appellant have thought or believed that under those circumstances it was possible for her to have been exposed to conception, either that she could have endured sexual intercourse on her part, or that her husband would have persisted in its indulgence? After the removal of the tumor the appellant had still better grounds for supposing that there was no pregnancy. He had then good reason to believe that if the respondent were in that condition the operation would produce a miscarriage, and as it did not have that result, it was a convincing circumstance in his mind that she could not be so. The removal of a tumor from that locality would not necessarily, perhaps, have that effect; but in this case, as I understand, it involved the removal of a part of the neck of the uterus, and in the debilitated condition of the respondent, and in view of the extent and complication of her difficulties, it would seem impossible for it to result otherwise; it would certainly be more liable to produce a miscarriage than the digital examination claimed by respondent's counsel to have caused it, or the employment of the small flexible silver probe to open the orifice to the uterus, left by appellant to permit the discharge of pus or other matter necessary to be expelled.

It must have been some time after the operation before the respondent herself had any idea that she was pregnant. In her testimony as a witness in the case she says, after speaking of the operation: "He did not dress my wound the next day, but the third day he did, assisted by Mrs. Young. And he came on then for some ten or twelve days * * *. and then he left and did not come again probably

for a week or ten days, and he called to see how I was, and I spoke about my bloated condition at that time; and he thought it was just gas, and to take some simple remedy to throw it off, etc. And I called him back about two weeks afterwards,—between two and three weeks he came back,—because I was feeling worse; and I called his attention then that I was still worse, * * * and I felt a movement, and it seemed rather singular to me, after such an operation as he said he had performed, that I should be such a figure as I was in fact, for I could scarcely mistake myself, though of course, under the circumstances, it was impossible to think of such a thing, * * * and he gave me an examination, and said it was nothing but bloat all the time. * * * I told him I was not such a figure before I had the operation, and asked him if I had to go the rest of my life with such a figure, in rather a light manner, not knowing what was the trouble."

This was more than a month after the operation was performed according to the respondent's own data, and she then concluded that it was impossible for her to be with child. But, about the twenty-seventh day of January, 1888, she seems to have become convinced, in her own mind, that such was the case, and that she could not be mistaken. She said in her testimony. "I told Dr. Jones —it was on Friday, and I may be a little mistaken in my date, but I know it was on Friday afternoon that I first spoke to him about being pregnant, and my husband also —and he said it was utterly impossible; that it could not be; that it was impossible after the operation he had performed for me to be in that condition; and he laughed at the idea at first, and then seemed a little startled before he left the house, and examined my abdomen externally—I presume some four or five times—and there was a movement; but he kept saying that it was contraction of the muscles, and contraction of the uterus; and every time he would see the movement after that 'it was contraction of the uterus and of the muscles;' and I kept telling him it could not be; that I knew I was pregnant, and told him,

from the twenty-seventh of January until I was delivered of that child, that I was confident I was pregnant, and I never could give up the idea; and he said that he could not hear the fœtal heart beat himself; he would bring his brother Will up on Sunday morning; and he did, and he sounded me, and he said it was nothing but gas, or tympanitis."

This account of the affair does not differ materially from that given by the appellant. It appears from his testimony that after the removal of the tumor he attended upon the respondent, from time to time, for a little more than a month; that the operation did not restore her to health, but her symptoms were much better and he discontinued his visits; that he did not see her again until about the nineteenth of January, at which time she called at his office; that he considered her very much improved, though she was still troubled with heartburn, dyspepsia, and complained of pain in the lower part of the abdomen. The appellant then renewed his visits, and during this time she mentioned having experienced a movement indicating pregnancy. Her husband, also, was convinced in his mind that she was in that condition, and so informed the appellant. The latter, however, seems to have been very skeptical upon the point. He felt certain that if she had been so the operation would have produced a miscarriage; claimed, from the history of the case given him by the respondent, that it was not possible for her to be pregnant. He, however, concluded, in order to satisfy himself thoroughly, that he would make an examination for indications of pregnancy, and have his brother, William Jones, who was a regular practicing physician, assist him. That about the first of February, 1888, such examination was made; that they found that the abdomen was exceedingly tender, due, as the appellant claimed, to the disease and to peritonitis, and that she was troubled with tympanitis, which caused excessive bloat, and in consequence of which, and the tenderness of the abdomen, neither of the tests, by percussion or ballottement, as physicians term

them, could be applied, nor were they able to discern the beat of the fœtal heart. This examination seemed to confirm the appellant in his belief that no pregnancy existed, and on the third or fifth day of February following—the evidence is ambiguous as to which one—he proceeded with the operation, in which, the respondent's counsel allege, he probed the uterine cavity.

The appellant claims that the object of that operation was to maintain the opening to the uterus, which he established when he removed the tumor, in order to admit of the discharge therefrom of any matter necessary to pass off. He states that he found the opening partially closed, and that mucous had collected, which it was necessary to remove. That to enable him to ascertain the depth of the opening, he used a small probe made of pure silver, and flexible, having a smooth point; that by means of which, with a small piece of absorbent cotton, he removed the mucous, but that the probe never entered the uterine cavity; that he called the next day and ascertained that the operation had caused no trouble, but that the respondent still complained of bloating, constipation, inability to retain food, loss of appetite, and that when she did eat anything it distressed her; that appellant continued his visits up to the twenty-fifth of February, administering to her simple medicines to alleviate her suffering; that he did not call again until the twenty-second of March following; that a few days previous to that time the respondent had had a loss of fluid, and her bowels were more distended; that he again made a digital examination and found no change in the neck of the uterus; that he called again on the twenty-fifth of March, and found that the fluid had about ceased its discharge, but that the respondent was suffering much pain, and he prepared a watery extract of opium, to be administered by suppository, one every three hours; that about the twenty-eighth of the same month the respondent was delivered of a dead fœtus.

This seems to have been the first incident which had the effect to induce the appellant to believe that the respond-

ent had been pregnant during the continuance of his treatment. He had tested the fluid, and concluded that it was a sort of water menstruation. She had not for a long time previous had regular menstruation, and he was of the opinion that this watery discharge indicated its return. He testified, in regard to the last operation performed by him, that it occasioned the discharge of only a small quantity of blood. The respondent, however, testified that she flowed a long time afterwards; "that is, the principal part of the forenoon, probably until along about three o'clock in the afternoon, some three hours; I might have flowed three hours; I know it was some three or four hours afterwards; and then we used a suppository, and it quieted me." And George Langford, the husband, testified that the appellant "shoved the probe clear in, way up to his hands; his hands was all blood, both his hands was full of blood when I gave him the wash-basin to wash him, and the towel." In answer to a question as to what effect the probe had upon Mrs. Langford in regard to flooding or otherwise, the witness stated: "Why, it made the blood gush right out into the blankets and the clothes and sponges I had there." The witness further stated that he changed it two or three times; that there was quite a quantity at first; it wet the blankets through, and the towels, and then he had clothes doubled up afterwards, and he changed them twice before it got down to its regular courses; that, he should judge, it was a "couple" of hours or so. That this was a highly exaggerated statement is quite evident upon its face. It is not corroborated by other testimony, nor consistent with reason. But if it were entitled to full credit it would not establish the two main grounds upon which the action was founded—that the appellant was negligent in failing to discover the pregnancy, or that he destroyed the life of the fœtus. The appellant was unfortunate in not discovering that the respondent was pregnant, as it is apparent that her whole case was sought to be built upon that circumstance. Still, it does not appear that if he had known the fact his

treatment of her would have been different from what it was. It was necessary, as has been suggested, to remove the tumor whether the respondent was pregnant or not; and that the appellant performed the operation skillfully and successfully the evidence shows beyond any question; and is also shown, it seems to me, by equally as cogent proof, that her sickness was of such a nature as to baffle the skill of a physician to detect the pregnancy by any of the modes known to medical science. Other physicians might have been more successful, might possibly have exercised better judgment in regard to the matter, but it would not follow that the appellant was liable to damages for malpractice.

A liability in such a case does not attach as against a doctor any more than it would against a lawyer who commits an error in the practice of his profession. The law exacts the same acquirements and duty from each—that he shall possess a reasonable degree of learning and skill, and exercise it according to his best judgment. It is not a difficult matter to indicate, from a retrospective standpoint, the proper course to have pursued in regard to affairs, however complicated they may have been. That is very safe ground to occupy, and the would-be wise and sagacious usually have sufficient prudence not to venture upon any other. They know thoroughly, and can point out accurately and decidedly, what course should have been pursued—after the occurrence to which it related has transpired. Nor will they hesitate to exact from the one charged with the duty, and who undertook its performance with no light save that derived from study and experience, as perfect and complete a compliance therewith as though it were undertaken in the full light of subsequent events. If the conduct of actors in important transactions were to be judged from such a basis it would never escape criticism and censure, however faithful and efficient it may have been, as there always may be found that some of the minor details of the affair have not been observed with due nicety, or which could not have been obviated or omitted by the adoption of

other methods.   Hence it would be unjust and unreasonable to attempt to determine the merits or demerits of the mode of performance of a transaction from such a view.

The respondent's counsel in this case are able to animadvert upon the failure of the appellant to discover the respondent's condition of pregnancy, and to draw inferences therefrom unfavorable to him.   They can speciously and eloquently urge, after the development of the affair, that the evidences indicating the result which followed were so unmistakable that any physician could have easily anticipated it; but they are not able now to point out how the appellant, from a prospective view, could have ascertained the fact with any degree of certainty under the peculiar circumstances attendant upon the respondent's sickness. It is true that the respondent and her husband, as she testified, became convinced that such was the case, and so informed the appellant; but it clearly appears, from the testimony of both, that it was only a matter of conjecture with them.   The appellant would not have been justified in acting upon that kind of information, which, in effect, was not much beyond a suspicion.   What excuse could he have made for suspending his treatment, through an apprehension of injury resulting to the fœtus, in case there were one, when the consequences of the suspension would of necessity be serious.   It was highly important, as anyone must know, that the opening which the appellant left in the uterus for the discharge of matter necessary to pass off, should be maintained.   In order to determine in regard to the existence of the pregnancy, the appellant was compelled to rely upon the history of the case, upon his own knowledge of the circumstances and surroundings of the affair, and upon those tests established from observation and experience as indications of it.

Time, however, which is the only certain proof of the correctness of any theory, showed that the appellant's conclusions were wrong in that particular; but that did not prove him guilty of unskillfulness or negligence.   He did not undertake, in his treatment of the respondent's case,

XVIII.  OR.—21.

that his judgment was infallible; he only agreed to exercise his best judgment. The claim of respondent's counsel that the appellant negligently and unskillfully caused the death of the fœtus is very flimsy indeed. There is no testimony upon that point, as I can discover, worthy to be dignified by the name of "evidence." It is claimed by said counsel that the appellant entered the uterine cavity with a probe, consisting of a metal instrument, punctured the sack of water containing the fœtus and destroyed the placenta; but the claim is so absurd, as I view it, that it is hardly entitled to consideration. What proof is there that the little flexible probe, which the appellant used in clearing out the opening he had made in the neck of the uterus, when he removed the tumor, ever entered the uterine cavity at all? George Langford swore, in an uncouth and apparently reckless manner, that "he (referring to appellant) shoved it, (the probe), way up to his hands." If that testimony were entitled to full credence, it would not prove that the probe entered the uterus, or that it punctured the sack of water, and it is evident that it did not do the latter, for if it had the water would have flown out immediately. The witness seemed desirous of leaving the impression that the appellant performed a brutal operation upon his wife, in which he assisted. The appellant shows how the operation was performed and for what purpose, and the manner in which he used the probe. The claim that the digital examination had affected the fœtus so as to destroy its life, is absolutely puerile. Any-one at all conversant with anatomy must know that such a consequence would be almost physically impossible. The placenta could hardly be disturbed by such an examination, nor the sack of water containing the fœtus be thereby broken. That the fœtus would have died under the circumstances of the respondent's condition, if no examination had been had after the removal of the tumor, is morally certain. It could not be expected to mature in the condition of the respondent's health; she evidently was afflicted with chronic peritonitis, superinduced by a

cancerous diathesis — which involved the uterus. Her
efforts to disguise her deep-seated malady were true to
womanly instincts; but it was too unmistakeable to be
hidden. The long-continued pain in the abdomen, the
constant suffering, and her enfeebled appearance, be-
trayed an infirmity which no innocent dissimulation could
conceal.

The respondent's counsel claim that there was sufficient
evidence of the appellant's negligence and unskillfulness
in his treatment of the respondent to at least justify the
circuit court in submitting the matter to the jury. If that
were so, said court had no other alternative  The prac-
tice, however, of leaving the jury to determine such cases
has been permitted often, when the responsibility was·
really upon the court. It is wrong and unjust to the med-
ical profession to pursue such a course; it tends to encour-
age the institution of suits against its members when no
grounds exist therefor. A physician, in the treatment of
disease, or in the performance of surgical operations, does
not always achieve that success he desires. Circum-
stances often intervene over which he has no control,
and render his treatment unsatisfactory. This is more es-
pecially so with surgery. It frequently happens, in the
reduction of a fracture or dislocation, that from some
cause, for which the surgeon was in nowise responsible,
the parts of the broken bone have not properly united,
have been found not to be in perfect apposition, or the dis-
located joint to be enlarged, or that muscular action of the
limb has become suspended, or the limb become crooked;
and sometimes, in consequence of important nerves having
been severed at the time of the fracture, a loss of sensa-
tion of the parts is occasioned, resulting in a permanent
numbness, and amputation becomes necessary. In a ma-
jority of such cases the party injured by the casualty will
claim damages against the surgeon who attended upon
him, and have no difficulty in having an action instituted
to enforce it, predicating his cause upon alleged negli-
gence in the reduction of the fracture or dislocation, or of

insufficient support to the broken parts, or of too tight bandaging, or upon some other pretext, but relying mainly upon the deformity of the limb as the ground for a recovery; and generally, through the sympathy, prejudice or stupidity of a jury, succeed in mulcting the defendant in damages. I have listened to the trial of several such cases, participating in some of them as attorney, and I have never yet heard an argument in favor of a recovery that did not consist almost entirely in commiserating the unfortunate plaintiff, and in lampooning and ridiculing the more unfortunate surgeon.

The average juror knows very little about such matters. If he has sufficient discretion to understand them in the outset, he will lose it by the time he has heard the expert testimony and the summing up of the counsel. A trial court should never allow a case of malpractice to be submitted to a jury unless the plaintiff has fairly shown, by competent proof, that the defendant is guilty of the charge alleged against him. I am satisfied that actions of that kind against physicians, especially surgeons, are liable to incite injustice, and are detrimental to the interests of the community. Persons who devote their lives to the study of physiology and anatomy, with a view to relieve the misfortunes and sufferings of mankind, deserve encouragement. The practice of bringing that character of actions against surgeons of acknowledged skill and ability, and subjecting them to the payment of large sums of money, has had a strong tendency to induce them to hesitate about setting broken bones or performing other operations essential to the alleviation of human misery, and if not checked, is liable to drive them out of the profession and leave the performance of its duties to irresponsible quacks and empirics.

I have examined the evidence in this case carefully, and am of the opinion that, as a whole, it is not sufficient to establish that the appellant was unskillful or negligent in respect to the matters alleged in the complaint. The circuit court may properly, perhaps, have refused the

non-suit until all the evidence in the case was before it, but it should then, upon the renewal of the motion, in case it were renewed, have granted it. The counsel for the appellant did not renew the motion in terms, but contented themselves by requesting the court to give the following instruction: "There is no evidence in this case that plaintiff has suffered any damages at the hands of the defendant." I doubt very much whether this mode of raising the question was strictly and technically the correct one. It seems to me that the appellant's counsel should, if they had desired to raise the question as to the sufficiency of the evidence to be submitted to the jury, have renewed their motion for a non-suit, or, possibly, they might have had the right to move the court to direct the jury to return a verdict in favor of the appellant. But as to that, I deem it unnecessary, at this time, to express any opinion.

The inquiry to Dr. W. E. Rinehart, when on the stand as a witness, in regard to what he said to J. V. Bridges, as before mentioned, and the testimony of the said Bridges, purporting to be what the witness did say to him, were clearly incompetent. The witness was called by the respondent, and testified, after refusing to describe the symptoms of pregnancy and declining to give expert testimony, as follows: "I am acquainted with Mr. and Mrs. Langford. I think the first time I saw her was in May, 1888. I was called in consultation with Dr. Frazer, and possibly Dr. Kelley or Glisan, I forget which, and we examined her to ascertain her condition. At that time she was very weak, and suffering, I should judge, from subacute peritonitis; and on local examination we discovered that a part of the side of the neck of the womb had been removed, possibly a third of it, on the right side. I don't know what it might have resulted from; don't know that I have positively any opinion as to what it resulted from in this case; it might result from blood poisoning in cases, but I don't know what was the cause of it in this case. Did not at that time discover any appearances indicating

cancer; did not at that time think she was affected with cancer. I made a subsequent examination in August, 1888, and found that the neck of the womb at that time was considerably hardened, and granulations were present, and I judged from her condition that she had had a cancer, and that it was redeveloping; but on account of the length of time that has expired since then, and from the fact that she is still alive, it appears as though she did not have cancer; still I could not say positively; my opinion is now some stronger. In July, 1888, I did not think she had a cancerous condition. I had the same opinion then I had after the first examination; I felt very certain there was no cancer." This is the substance of the witness's testimony before the said inquiry was made.

Section 838, Civil Code, permits the party producing a witness to contradict him by other evidence, and to show that he has made at other times statements inconsistent with his present testimony; but that section does not allow the party to inquire about matters regarding which the witness has not given any testimony, or testimony of a weak and unsatisfactory character, and then prove his statements made at another time in reference to such matters. The intent of the provision was to allow a party producing a witness who testifies adversely to him regarding some matter which directly affects the merits of the case, to impeach such testimony in the manner there pointed out. The object of the section was to prevent the party from being prejudiced by the evidence of his own witness. He may, of course, call his attention to any statements he may have made at other times, for the purpose of refreshing his memory, but he has no right to ask him about his having made some statement at another time, favorable to the party's side of the case, which the witness has given no testimony in regard to; nor, *a fortiori*, to prove what that statement was. The Code certainly did not intend to permit a party to get in testimony as a make-weight, in support of his cause of action or defense, by such a course; and that evidently is the character of the said

statement. To allow a party, after calling him as a witness
and failing to elicit from him any advantageous testimony,
to prove that the witness at some other time and place had
made statements favorable to the claim of the party, is a
strange mode of securing proof. It would be a kind of
evidence which I could not distinguish from hearsay.
Counsel for appellant cited a number of authorities to
show that such a course was not permissible; but I think
that the bare statement of the proposition is a sufficient
refutation of its correctness. If it were proper, a case
could be made out many times by proof of what third
persons had said; it would only be necessary to call the
persons as witnesses and attempt to show by them the
substance of the matter embraced in the statements, and
having failed in that, then to prove what such persons had
said at another time and place, when they were not under
oath, and obtain the benefit of that as direct evidence of
the fact. Such a construction would enable parties to
employ as a sword what was intended as a shield. Instead
of availing themselves of the benefits of the statutory rule
in order to avoid the effect of damaging testimony given
against them by a witness called to prove a fact in their
favor, they could make use of it for the direct purpose of
establishing the fact. It is enough to say that the legisla-
ture never intended by said provision of the Code to adopt
any such absurdity.

The appellant's counsel urge, with much force and rea-
son, that exceptions to certain instructions given by the
court to the jury were well taken. Said instructions were
as follows: "Some of the testimony introduced is the opin-
ion of experts, physicians, surgeons and nurses. The law
allows the opinion of the witness on questions of science
and art to be heard in evidence when the witness is skilled
in such science or art. Such evidence, however, is to be
received with caution. The opinion of an expert on the
question of medical or surgical practice should be based
on facts. In this case the experts have testified upon hy-
pothetical statements of fact, or upon the assumption that

the facts alleged, and concerning which other witnesses have testified, are true. The value of the opinion of those experts must be estimated by considering how far the facts assumed have been substantially proven by the testimony in the case, and what appears to be the knowledge, skill and experience of the experts themselves." Also, "This is a case where the amount of the damage is left in the main to the discretion of the jury. That discretion, how ever, ought to be exercised wisely, and not with any passion, prejudice or sympathy; but it should be a sound and wise discretion ; and if you find that there was gross misconduct and wilful negligence on the part of the defendant in this case, then, besides what would be merely compensatory damages, if ascertained, you would be authorized (provided such a state of facts clearly existed) to find also what might be called aggravated damages, —something beyond compensation. But if the cause of action, if any, proven to you, be the result of honest mistake or slight negligence and oversight that is not altogether excusable and yet is not intentional, then the measure of damages ought to be limited to something like compensation, considering the trouble, pain and suffering, if any, which the plaintiff has suffered from such negligence or mistake."

It is contended by the said counsel, in regard to the former instruction, that the portion thereof which is to the effect, that the opinion of a witness on questions of science and art, where the witness is skilled in such science or art, given as evidence in a case, is to be received with caution, is erroneous. Said counsel maintain that such evidence is entitled to due weight, and cite *Atchison, T. & S. F. R. Co.* v. *Theel,* 4 Pac. R. 352; *Getchell* v. *Hill,* 21 Minn. 464; *Wood* v. *Baker,* 13 N. W. Rep. 597; *Carter* v. *Baker,* 1 Saw. R. 525, and several other cases in support of their position. They also insist that said court, under § 200, Civil Code of Oregon, had no right to comment on the effect of such testimony any more than upon other testimony. It would rather seem, from the reading of the in-

struction, that the court did not intend to determine that expert testimony in such a case should be received with caution because it was inherently weak, but for the reason that the opinions of the witnesses were not based upon facts, but were based upon hypothetical statements of facts, or upon the assumption that the facts alleged and concerning which the witnesses testified were true. If I am correct in this, then the court was unfortunate in its selection of the language employed. Basing the opinions of the witnesses upon hypothetical statements of facts did not affect the character of the testimony as to its strength or weakness. The jury were not to apply the testimony at all unless they found that the supposed facts were real; and if they determined that such was the case then "the opinions would have been based upon facts." That was the very question for the jury to determine, whether the opinions were based upon facts or not. The opinions would have force only according to the decision of the jury upon the preliminary question. If the court had instructed the jury not to consider the opinions of the medical experts as evidence, unless they found that the facts upon which the opinions were predicated existed as assumed, it would have been highly proper; but instructing them that such evidence was to be received with caution, under the view above suggested, was misleading. I think that character of evidence stands upon the same footing as any other. The Code, § 706, and subdivision 9 thereof, provides, in effect, that the opinion of a witness on a question of science, art, or trade, when he is skilled therein may be given in evidence on the trial; and it makes no distinction between that character of evidence and any other. I do not see, therefore, by what authority the circuit court, if it had so intended could hold that such evidence should be received with caution.

The point of the objection of the appellant's counsel to the latter instruction is that there was no evidence in the case which justified the circuit court in charging the jury that if they found that there was gross misconduct and

wilful negligence on the part of the appellant, then, besides what would be merely compensatory damages, they were authorized to find aggravated damages. The view I have taken of the evidence herein, as before shown, fully sustains the counsel's said objection. I do not think the evidence shows that the appellant was guilty of any misconduct or negligence in the premises, much less gross misconduct and wilful negligence. The two instructions above set out were clearly erroneous in the particulars referred to. The respondent's counsel, however, contend that neither of the exceptions ought to be considered, as each of them is to the whole instruction instead of being to the portion thereof claimed to be faulty. The general rule is that an exception to an entire instruction can not be sustained, unless the instruction, taken as a whole, is bad. Counsel should, in such cases, except to the special portion of the instruction claimed to be erroneous. That course would call the attention of the trial court directly to the point raised. I very much doubt whether either of the said exceptions was sufficiently specific; but under the view taken of the case, it is not necessary to express an opinion upon that question.

The judgment appealed from will be reversed. Ordinarily such a disposition of a case is followed by an order remanding it to the court below for a new trial; but, under the peculiar circumstances existing in this case, such order will not be made. It will be remanded, however, with directions to dismiss the complaint.