[No. 31393.  Department Two.  May 17, 1951.]

ALVON L. DERR *et al., Appellants,* v. L. J. BONNEY *et al., Respondents.*[1]

*Hamblen, Gilbert & Brooke (Philip S. Brooke, Jr.,* of counsel), for appellants.

*Cannon, McKevitt & Fraser* and *McCallum & Zellmer,* for respondents.

[1]Reported in 231 P. (2d) 637.

SCHWELLENBACH, C. J.—This is an appeal from a judgment of dismissal in a malpractice case, entered at the close of the plaintiffs' testimony. May 7, 1947, Mrs. Derr fractured an ankle as the result of a fall from a bicycle. She was taken to the office of Dr. L. J. Bonney, a physician and surgeon, who has been practicing his profession in Odessa since 1931. He had set about 250 fractures since locating there. He had been the family physician for years. The first thing he did was to take an X ray of the injury, from which he diagnosed a fracture of the lower fourth of the fibula and an avulsion fracture of the medial side of the tibia. There was a small piece of the tibia, on the medial side, which was broken off. He found a fracture of the posterior lip of the tibia, which was shoved up and displaced upward to a sixteenth of an inch, and which he attempted to put back in place, but was not altogether successful. After setting the fractures he put a stockinette on the ankle and placed it in a plaster cast. Mrs. Derr complained of severe pain and he explained that that was to be expected. There is some dispute as to when he saw her afterwards, although his records showed that he saw her May 7, 8, 9, 10, 11, 12, 13, 23; June 2, 12, 25; July 7, 13, and about September 1st. The cast was not removed until July 13th. The doctor was away on a vacation from July 4th to July 13th. No X ray was taken while the cast was on. However, one was taken immediately upon the removal of the cast on July 13th. It showed the posterior lip of the tibia to be exactly in the same position as it was when the first picture was taken.

In the meantime Mrs. Derr's ankle became stiff and swollen and she continued to complain of severe pain. She could not walk without the use of crutches and could place very little weight on the injured foot. When the second X ray was taken, the doctor told her that it showed a good, firm union, and that the alignment of the bone was good. In September he told her to throw the crutches away and start walking.

In September the Derrs moved to Spokane. October 22nd she consulted Dr. William E. Grieve, who specializes in

orthopedic practice. He examined the ankle and found it to be swollen and it appeared that the foot was displaced posteriorly. The heel slipped out a little farther than it should, but the X ray did not show that the foot was displaced forward. He was under the impression that the cause of stiffness, soreness and pain was due to the scarring of the soft tissues around the joint, resulting in circulatory disturbances. He recommended physiotherapy, rest and exercise. This treatment continued for several months without any appreciable benefit. The ankle continued to grow more stiff and the pain remained severe. He testified that there is very little action in the ankle joint and that she will have a stiff ankle for the rest of her life.

The negligence charged against respondent was that he:

(1) Negligently failed to attempt to reduce the swelling of the ankle joint;

(2) Negligently failed to set the broken bone in the ankle properly;

(3) Negligently failed to employ the use of X ray after he had set the ankle, to ascertain whether or not a satisfactory union had been secured;

(4) Negligently placed the ankle in a cast immediately following the accident, before any attempt had been made to reduce the swelling;

(5) Negligently failed to care for the appellant following the accident, by reason of the fact that he departed on a vacation without first removing the cast from the ankle.

In the recent case of *Fritz v. Horsfall*, 24 Wn. (2d) 14, 163 P. (2d) 148, we stated the following general rules governing actions for malpractice: (1) An individual licensed to practice medicine is presumed to possess that degree of skill and learning which is possessed by the average members of the profession in the community in which he practices, and that he has applied that skill and learning with ordinary and reasonable care to those who come to him for treatment; (2) The contract which the law implies from the employment of a physician or surgeon is that the doctor will treat his patient with that diligence and skill just mentioned; (3) He does not incur liability for his mistakes if

he has used methods recognized and approved by those reasonably skilled in the profession; (4) Before a physician or surgeon can be held liable for malpractice, he must have done something in the treatment of his patient which the recognized standard of medical practice in his community forbids in such cases, or he must have neglected to do something required by those standards. In order to sustain a judgment against a physician or surgeon, the standard of medical practice in the community must be shown, and, further, that the doctor failed to follow the methods prescribed by that standard; (6) It is not required that physicians and surgeons guarantee results, nor that the result be what is desired; (7) The testimony of other physicians that they would have followed a different course of treatment than that followed by defendant, or a disagreement of doctors of equal skill and learning as to what the treatment should have been, does not establish negligence. In such cases, the court must hold that there is nothing upon which the jury may pass, the reason being that the jury may not be allowed to accept one theory to the exclusion of the other; (8) Negligence on the part of the physician or surgeon by reason of his departure from the popular standard of practice must be established by medical testimony. An exception is recognized in those cases in which negligence is so grossly apparent that a layman would have no difficulty in recognizing it.

In this case the only witnesses were Mr. and Mrs. Derr, Dr. Bonney and Dr. Grieve. We can consider the testimony of Mr. and Mrs. Derr as to what was actually done, the pain which she suffered, and the result of what was done. But as to whether what Dr. Bonney did, or failed to do, constituted negligence under the rules above set forth, we must be guided by medical testimony. The rule, and the reason for the rule, was set forth in *Hollis v. Ahlquist*, 142 Wash. 33, 251 Pac. 871.

■ "A doctor is not to be charged with negligence because the result is not what is desired. [Citing cases.] In spite of all his skill and learning, there are many factors over which he has no control, hence the rule so often an-

·nounced by the courts that he is responsible in damages only when he fails to possess such skill and learning as is usually possessed by the average member of the profession in the locality where he practices, and to apply that learning with reasonable care."

The effect of a motion for nonsuit admits the truth of the evidence of the party against whom the challenge is made and all inferences reasonably drawn therefrom and requires that the evidence must be interpreted most .strongly against the challenger and in the light most favorable to the opposing party. *Kellerher v. Porter*, 29 Wn. (2d) 650, 189 P. (2d) 223.

Turning now to the specific allegations of negligence set forth in the appellants' complaint, we are unable to find anything in Dr. Grieve's testimony to substantiate the contention that respondent negligently failed to reduce the swelling of the ankle joint. Dr. Grieve was of the opinion that this was caused by circulatory disturbances of the soft tissue. He thought there was a possibility that nature would take care of that and recommended physiotherapy, which was not effective. This was the extent of his testimony on this subject. As to what might have been done, he said nothing. There is nothing on which a jury could base a finding that this swelling was the result of any act or omission of Dr. Bonney.

Taking up the question as to whether or not respondent negligently failed to set the broken bone in the ankle properly, Dr. Grieve testified that the over-all alignment is good, but that the posterior lip of the tibia is still displaced slightly, and that that is a very vital part as far as function is concerned in this fracture. He also testified that he has treated fractures of this type where he did not get a good result, even with an open reduction. He testified that his procedure to reduce fractures of this kind is to give a general anesthetic, manipulate the ankle and apply a cast, and check it with an X ray to see that he had the proper alignment. He did not testify, however, that respondent used the wrong procedure, or that he failed to do anything in conformity with correct procedure. This also disposes of the appellants'

further allegation of negligence charging that respondent placed the ankle in the cast before making an attempt to reduce the swelling.

As to whether or not respondent negligently failed to employ the use of X ray after he had set the ankle, to ascertain whether or not a satisfactory union had been secured, although Dr. Grieve takes X rays through the cast, he testified that one cannot get a clear picture through the cast. He also testified that a picture through the cast would not have benefited respondent in this instance, in ascertaining whether or not a satisfactory union had been secured.

Turning now to the charge that respondent negligently failed to care for appellant following the accident, by reason of the fact that he departed on a vacation without first removing the cast from the ankle (the cast was on from April 7 to July 13), Dr. Grieve testified that a fractured ankle such as Mrs. Derr's should be kept in the cast until there was a good bony union; that it might take a year. He had no recollection of having told Mr. and Mrs. Derr that the cast had been on too long. When asked if it was possible that he made that statement, he replied: "It is possible, but three months is not a particularly long time to have a cast on in a thing of that nature."

Appellants urge on appeal, and attempted to introduce evidence at the trial, to the effect that respondent failed to discharge his duty to appellant when he did not refer this case to a specialist, upon realizing that the injury indicated treatment beyond the facilities at hand in Odessa. They rely primarily upon our decision in the very recent case of *Kelly v. Carroll*, 36 Wn. (2d) 482, 219 P. (2d) 79, wherein we said:

"If a practitioner, such as the appellant, declines to discharge his duty to call in a qualified doctor when the situation obviously calls for it, he proceeds at his peril."

In that case appellant was a drugless healer, not a physician or surgeon. The complaint therein alleged that Kelly was suffering from appendicitis and that defendant negligently diagnosed the disease as "reaction," a condition

not even similar to appendicitis; that under the rules of the profession of which defendant was a practitioner, had he correctly and timely diagnosed the case, defendant, in the discharge of the duties of his profession, would have referred the case to a medical doctor for an appendectomy; that in failing to properly diagnose and refer, Kelly was deprived of the benefit of surgery and died therefrom.

In the case at bar there was no allegation of negligence for failure to refer the case to a specialist, nor do we believe that this theory falls naturally within any of the specific acts of negligence alleged. See *Ennis v. Banks,* 88 Wash. 237, 152 Pac. 1037. The trial court correctly sustained an objection to the question as to whether or not he suggested to appellants that they should consult a specialist, for the reason that there was no allegation in the complaint to justify such a question.

We cannot start out with the premise that appellant wife will have a stiff ankle for the rest of her life, and conclude therefrom that her condition is due to the negligence of respondent. We must find that he must have done something in the treatment of his patient which the recognized standard of medical practice in his community forbids in such cases, or that he must have neglected to do something required by those standards. This question can only be determined by medical evidence.

Appellants contend that appellant herself, with her permanent limp, was a living example of respondent's handiwork. They refer to *Cornwell v. Sleicher,* 119 Wash. 573, 205 Pac. 1059, a case involving a broken arm which had had not been properly set. There the X rays showed that the fractured ends had not been placed in apposition to each other, that they knitted in much the same position they were in prior to any attempt at reduction. There was also testimony to show that the fracture was one without complications, and was easy to reduce. Lay testimony as to the crookedness of the arm, which was visible to the eye, was so convincing that the question of the doctor's negligence should have been submitted to the jury.

■ In the case at bar lay testimony was not relied upon. The testimony of Dr. Grieve was relied upon. Furthermore, the facts in the instant case are so different from those in the cited case as to render it distinguishable on that ground alone. Here the fracture involved is one complicated of reduction, as Dr. Grieve testified, and the over-all result of the treatment was a "good union" of the bones. Granting that Dr. Grieve was a reluctant witness, it was upon his testimony that appellants rely, and they are bound by it.

The judgment is affirmed.

ROBINSON, MALLERY, GRADY, and HAMLEY, JJ., concur.