**Edna CAMPBELL, Plaintiff,**

**v.**

**UNITED STATES of America, Defendant.**

**No. 69–50–Civ–J.**

United States District Court,
M. D. Florida,
Jacksonville Division.

March 3, 1971.

Arthur T. Boone, Walter C. Rawls, Jr., and Jack F. Wayman, Jacksonville, Fla., for plaintiff.

John L. Briggs, U. S. Atty., John D. Roberts, Asst. U. S. Atty., M. D. of Fla., Jacksonville, for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

WILLIAM A. McRAE, District Judge.

### FINDINGS OF FACT

1. This suit was brought following denial by the Veterans Administration of an administrative tort claim filed by Edna Campbell, widow, as a result of the death of her 55 year old husband, William J. Campbell, Jr., while surgery was being performed on him (Campbell) as a patient at the Veterans Administration Hospital, Gainesville, Florida on December 15, 1967 at approximately 4:10 P.M.

2. On December 13, 1967, Campbell, a veteran of World War II, was admitted to the Veterans Administration Hospital, Gainesville, Florida for diagnosis and treatment of a mass in the left lung.

3. On December 14, 1967 bronchoscopy was performed which was nondiagnostic. On December 15, 1967 a left exploratory thoracotemy was performed which revealed the presence of a large metastatic node originating in the left lower lobe and extending to the hilum of the left lung in such a way as to involve the anterior surface of the midportion of the esophagus and the inferior aspect of the aortic arch. Dissection was made over the nodule tumor found at the periphery of the superior segment of the left lower lobe and this tumor mass was sent for frozen section which appeared to be epidermoid carcinoma. The pathologic anatomy was evaluated and the recurrent portion of the left vagus nerve was found to be surrounded by tumor at the most inferior portion of the arch of the aorta. Approximately 1 cm. of the anterior surface of the mid-esophagus was loosely adherent to the tumor mass. Upon evaluating these findings it was felt that although total resectional therapy of the left lung and mediastinal nodes would be hazardous, on the other hand such a resection offered the only hope that the patient would survive. Having made this decision, the dissection along the hilar region was then begun to remove all of the tumor tissue and metastatic node with the specimen. The left main pulmonary artery was ligated extrapericardially. The superior and inferior pulmonary veins were then ligated and division of these three vessels was performed without difficulty. The tumor mass was then excised with considerable difficulty from the anterior surface of the esophagus. By gross observation it appeared that the esophagus was then completely free of tumor. The dissection was then carried toward the hilum of the lung. The bronchial arteries from the aorta were divided and ligated before the dissection of the hilar region but some bleeding occurred during this procedure. By both sharp and blunt dissention the left main stem bronchus and the surrounding tumor were freed from the inferior aspect of the arch of the aorta. The recurrent portion of the left vagus nerve was divided at the aortic arch so as to be included in the mass resection. The tumor was completely freed from the arch of the aorta and the dissection was then extended toward the carina. In order adequately to expose the bifurcation of the trachea as well as the subcarinal nodes the arch of the aorta was retracted laterally to the left. The carina was thus adequately exposed and a subcarinal lymphadenectomy performed. At this point, there was profuse bleeding from the tearing of the bronchial vessels at the posterior surface of the aorta which required suture ligature. The aorta was then retracted in order to expose the site of bleeding. By doing this, it was found that the posterior wall of the aorta which was weakening by the dissection of the tumor from the aortic wall was tearing about 1 cm. long and there was a large amount of bleeding from the aorta every few moments. The aorta was cross-clamped rapidly on each side of the rent in the vessel. Before the patient's blood volume could be restored, however, and the aortic tear sutured, the heart went into arrest and attempts at resuscitation were unsuccessful and the incision was closed. The patient was pronounced dead on the operating table.

4. Following the death of the veteran, an autopsy, authorized by Edna Campbell, was performed by Dr. Ecevarria on December 16, 1967 in the Veterans Administration Hospital, Gainesville, Florida. The autopsy protocol included the following information:

"* * * The metastatic tumor in the hilar area was markedly adherent and actually infiltrating the muscularis of the esophagus and quite adherent to adventitia of the aorta. The latter showed a tremendous degree of arteriosclerosis at autopsy with marked friability of the walls, extensive infiltration of cholesterol and calcium and ulceration of the atheromatous plaques."

5. At the time of his death, Campbell's occupation was carpenter. The annual salary of decedent was $4,560.00 as evidenced by his United States Income Tax Return form 1040 for 1967.

6. Edna Campbell, widow is the only survivor who was dependent for support upon decedent at the time of his death. She earned $704.12 for the year 1967. She has been awarded monthly social security benefits of $107.30. She also received the proceeds of a life insurance policy in 1967 in the amount of $4,985.20. She has also operated her own beauty shop, the net earnings from which were negligible. The cost of last sickness and burial including an autopsy ordered privately by the widow was apparently $1,090.00. Veterans Administration burial benefits and social security lump sum death payment were in the total sum of $565.00 and the balance or out-of-pocket expense to the widow was $525.00. The veteran's life expectancy at the time of the operation was generally estimated at less than six months.

7. The opinions expressed by the doctors were conflicting, but the Court finds it difficult to place reliance upon the testimony of Dr. Beck, plaintiff's expert medical witness. He testified, "Well, I believe an error in the handling of a scalpel caused the laceration." [in the aorta.] This is contradictory to his testimony that one end of the opening was "cut" smoothly and one end was "cut" ragged. (Deposition, p. 14). Moreover, the Court cannot overlook the facts that Dr. Beck is not Board Certified by the American Board of Surgeons; that he never did any residency; that he is not a member of any medical association; that he has never performed heart surgery; that he does not perform major operations; that he was previously committed to a mental institution and that he has been convicted of a crime. The qualifications of defendant's experts are of high quality.

8. Dr. M. W. Wheat, Jr., Chief Thoracic and Cardiovascular Surgery, College of Medicine, University of Florida, testified that the complication resulting in death to Campbell, represented an expected hazard in this kind of operation and nothing further could have been done to prevent death, and no negligence whatsoever was involved. He testified also blood was available and that a heart and lung machine would not have saved the patient's life.

9. In summary plaintiff has failed to prove by a preponderance of the evidence that the surgeons either did something which they should not have done, omitted to do something which they should have done, or failed to exercise the required degree of care, skill and diligence usually exercised by surgeons in similar cases. In a malpractice action, a judgment cannot be entered for the injured patient predicated on speculation or conjecture.

## CONCLUSIONS OF LAW

A. *Jurisdiction and Basis of Complaint.*

(1) This cause of action arose pursuant to the Federal Tort Claims Act. 28 U.S.C.A. §§ 1346(b), 2671, et seq.

(2) In accordance with the provisions of 28 U.S.C.A. § 1346(b), the United States would be liable in a Tort Claims Act case under circumstances where a private person would be liable according to the law of the State of Florida.

(3) Plaintiff has alleged in substance that agents of the United States, namely, Veterans Administration medical doctors, were negligent in their performance

of a surgical operation upon plaintiff's deceased husband and that such negligence proximately caused the death of the deceased.

### B. *Issue of Negligence*

■ (1) Plaintiff has failed to establish by a preponderance of the evidence that any agent of the United States was negligent in treating or during the surgical operation of the deceased, William J. Campbell, Jr. A medical practitioner has the duty to apply to diagnosis and treatment of his patient the ordinary skills, means and methods that are recognized as necessary and which are customarily followed in the particular case, according to the standard of those who are qualified by training and experience to perform similar services in the community. See Lab v. Hall, 200 So.2d 556 (Fla.App.1967). However, a disagreement among doctors of equal skill and learning as to what the diagnosis and treatment should have been, does not establish negligence as a matter of law. Baldor v. Rogers, 81 So.2d 658 (Fla. 1955) (reversed on other grounds); Derr v. Bonney, 38 Wash.2d 678, 231 P.2d 637 (Wash.1951), 54 A.L.R.2d 193. The courts cannot hold a defendant in a malpractice suit to the theory of one opinion of physicians on a set of facts to the exclusion of other contrary opinion by other physicians, and approval of the actual treatment used by even a respectable minority of the medical profession relieves the defendant of a charge of malpractice. Baldor v. Rogers, *supra.*

"Admittedly the science of medicine is not an exact science. Physicians are not to be held liable for honest errors of judgment. They are allowed a wide range in the exercise of their judgment and discretion. To hold one liable it must be shown that the course which he pursued was clearly against the course recognized as correct by his profession. On the other hand the attending physician must use the judgment and form the opinions of one possessed of knowledge and skill common to medical men practicing in the same or similar communities. Regan, Doctor and Patient and the Law, Sec. 39, p. 227." Bourgeois v. Dade County (Fla.1957) 99 So.2d 575, 577.

"The responsibility of a physician or surgeon is to use ordinary skill and diligence and to apply the means and methods ordinarily and generally used by physicians of ordinary skill and learning in the practice of his profession to determine the nature of the ailment and to act upon his honest opinion and conclusion." Hill v. Boughton, (1941) 146 Fla. 505, 1 So.2d 610 Headnote 5.

■ (2) To hold a physician liable for errors in diagnosis or treatment it must be shown that the course which he pursued was clearly against the course recognized as correct by his profession. Bourgeois v. Dade County, *supra*. This the plaintiff has wholly failed to establish by competent evidence.

"A physician or surgeon must utilize reasonable care, skill and diligence in diagnosis and treatment of his patient and failure to possess the requisite skill or to exercise those requisite standards of skill and diligence may render him liable for resulting injuries, but he is not a guarantor of the correctness of his diagnosis or of a cure, and will not be held liable where he has employed reasonable skill in determining the diagnosis and has administered proper treatment without negligence, even though the desired results do not ensue." Atkins v. Humes (Fla.App.1958) 107 So.2d 253, Headnote 3.

"There is no fixed criterion by which to mark the dividing line between the degree of care that must be exercised by those who engage as specialists in the several branches or fields of medicine as compared to the general practitioners. Neither insures the correctness of his diagnosis. Generally, it is the duty of each to apply to the diagnosis and treatment of his patient the skills, means, and methods that are recognized as necessary to be followed

in the particular case according to the standards of those who are qualified by training and experience to perform similar services in the community. As said in Hill v. Boughton, 1941, 146 Fla. 505, 1 So.2d 610, 613, 134 A.L.R. 678: * * *." 102 So.2d 311.

(3) In the leading case of Langford v. Jones, 18 Or. 307, 22 P. 1064, 1069, the court in holding that the evidence was insufficient to impose liability upon a surgeon who removed a tumor from the neck of the uterus but did not discover that the patient was pregnant, appropriately observed:

"Other physicians might have been more successful,—might possibly have exercised better judgment in regard to the matter; but it would not follow that the appellant was liable to damages for malpractice. A liability, in such a case, does not attach as against the doctor, any more than it would against a lawyer who commits an error in the practice of his profession. The law exacts the same requirements and duties from each,—that he shall possess a reasonable degree of learning and skill, and exercise it according to his best judgment. It is not a difficult matter to indicate from a retrospective standpoint the proper course to have pursued in regard to affairs, however complicated they may have been. That is a very safe ground to occupy, and the would-be wise and sagacious usually has sufficient prudence not to venture upon any other. They know thoroughly, and can point out accurately and decidedly, what course should have been pursued, after the occurrence to which it related has transpired." Crovella v. Cochrane, 102 So.2d 307, 311, 312 (1958).

(4) Having failed to establish any negligence on the part of Dr. Mantini or Dr. Phalakornkul, or upon the other attending agents of the United States, who diagnosed and treated plaintiff's deceased husband, recovery against the principal, the United States of America, is disallowed.

### C. Scope of Employment

(1) The parties hereto have stipulated that Dr. Mantini and Dr. Phalakornkul were acting within the scope of their employment with the United States at the time they rendered diagnosis and treatment to William J. Campbell, Jr.

(2) The Court finds as a matter of law that these doctors were acting within the scope of their employment with the United States on December 15, 1967.

### D. Proximate causation

(1) A physician incurs no liability towards his patient unless his negligence proximately results in injury. Atkins v. Humes, 107 So.2d 253, 258 (2d Fla.App.1958). The evidence in the case at bar reveals that agents of the defendant administered proper treatment without negligence to plaintiff's deceased husband even though the desired results of the pneumonectomy operation did not ensue.

"Not every negligent act of omission or commission gives rise to a cause of action for injuries sustained by another. It is only when injury to a person who himself is without contributing fault has resulted directly and in ordinary natural sequence from a negligent act without the intervention of any independent efficient cause, or is such as ordinarily and naturally should have been regarded as a probable, not a mere possible, result of the negligent act, that such injured person is entitled to recover damages as compensation for his loss. Conversely, when the loss is not a direct result of the negligent act complained of, or does not follow in natural ordinary sequence from such act but is merely a possible, as distinguished from a natural and probable, result of the negligence, recovery will not be allowed." Cone v. Inter County Telephone & Telegraph Co. (Fla.1949) 40 So.2d 148, 149.

(2) The evidence is totally deficient in establishing that the intra-thoracic hemorrhage is such as ordinarily and naturally should have been regarded as a

probable, not a mere possible result of the performance of the lymphadenectomy. In a malpractice action, judgment cannot be entered for an injured patient predicated on speculation and conjecture. Atkins v. Humes, *supra*.

The Court finds that the plaintiff has failed to sustain her burden of proof in regard to both negligence and proximate cause and that defendant, United States of America, is entitled to judgment in its favor. Judgment will be entered in accordance with the foregoing Findings of Fact and Conclusions of Law.