CHARLES TOMER v. E. R. AIKEN, and A. W. TROUT, Appellants.

**Physicians:** NEGLIGENCE: DIAGNOSIS. In an action for damages resulting from an alleged negligent treatment of an injury to plaintiff's shoulder bones, the question of whether the injury was diagnosed as a dislocation or as a fracture, was, under the conflicting evidence, one for the jury.

**Negligent treatment:** DIAGNOSIS. The fact that a physician improperly diagnosed an injury as a fracture rather than as a dislocation was immaterial on the question of negligent treatment, where the treatment was suitable to reduce a dislocation.

**Negligence:** EVIDENCE. Negligence of a physician cannot be predicated on a failure to effect a cure of a dislocated shoulder bone, where it is shown that favorable results are not always obtained under any form of treatment.

**Same.** Negligence in permitting certain intervals to elapse between a physician's visits depends on the custom or practice in similar

localities, and not on the custom of a particular physician in his own practice.

**Improper treatment:** EVIDENCE. Where the employment of a physician has been terminated, he may refuse further attendance, and such refusal, where there is no further showing save the patient was suffering the pain usual in such cases, will not justify the admission of evidence that the same amounted to improper treatment; nor under the circumstances was negligence of the attending physician shown.

**Improper treatment:** EXPERT EVIDENCE. In an action for the negligent treatment of a dislocated shoulder, the evidence is reviewed, and in view of the conflict, is held to present a question for the jury as to whether the method of treatment adopted was proper.

*Appeal from Dallas District Court.*— HON. J. H. APPLE-GATE, Judge.

THURSDAY, DECEMBER 15, 1904.

ACTION for damages alleged to have resulted from the negligent treatment of the dislocation of the clavicle. The verdict was for the plaintiff, and from judgment thereon defendants appeal.— *Reversed.*

*Edmund Nichols* and *Shortley & Harpel,* for appellants.

*Cardell & Fahey,* for appellee.

LADD, J.— Only two errors are argued, but these involve the twelve points raised in appellants' belief. The one challenges the propriety of a hypothetical question, and the other the sufficiency of the evidence to support the verdict. On the 26th day of June, 1902, the plaintiff undertook to repair the tin roof on his house. When descending from the porch, he placed one foot on a stepladder about five feet high, which slipped, and he fell to the ground. The outer end of the collar bone, or clavicle, was dislocated from the shoulder blade, or scapula, or, technically speaking, the dislocation was of the clavicle

1. NEGLIGENCE: diagnosis.

from the acromion process. Dr. Aiken was called, but refused to treat the patient unless another physician were present. The family explained that they had been unable to get any one else, and the physician then sent for Dr. Trout to assist him. Upon his arrival, Tomer was examined, and, according to four witnesses, the physicians announced that the collar bone had been fractured or broken. Two of these were uncertain of the language used, while the physicians testified they concluded that it was a dislocation only, and Dr. Aiken that he had explained to Tomer that the collar bone was broken away from the scapula; and in this he is confirmed by another witness. While the physician, in trying to explain the injury so as to be within the comprehension of those not familiar with medical terms, may have been misunderstood, yet the evidence was such as to leave the question as to whether the case was properly diagnosed an open one for the jury's determination.

If it be conceded, however, that the physicians declared it a case of fracture of the clavicle, rather than dislocation, they are not liable, unless improper treatment followed. No one claimed on the trial that the clavicle had been fractured, nor was there any evidence that the dressing applied was adapted peculiarly to remedying that defect. If suitable at all, it was as appropriate to the reduction of a dislocation. In these circumstances there was no occasion to submit the issue raised in the first count of the petition that, because of a mistake in the diagnosis, the plaintiff had been treated for a fracture, rather than a dislocation, to the jury. If the treatment was such as reasonable skill and care exacted for the cure of a dislocated clavicle, defendants were not liable, regardless of what their diagnosis may have been; otherwise they were.

2. NEGLIGENT TREATMENT: diagnosis.

II. Was the dressing such as should have been used in reducing the dislocation and securing rearticulation? Ordinarily, little difficulty is experienced in reducing the dislocation. The trouble is to retain the bones in a position so

that articulation will be effected. The narrow extremity of the articulating surface, the movability of the shoulder, the contraction of the muscles, and the possibility of ligaments falling between, render the result somewhat experimental. In applying the dressing difficulty is experienced in securing a purchase which will hold the bones on the same level. Dr. Ross, upon whose testimony as an expert plaintiff relied, freely admitted that "there is no assurance under any form of treatment that the bone is going to stay there," and testified farther that "the results are not always satisfactory under any form of treatment, but the majority of them get well. Complete is more difficult than incomplete dislocation, but are sometimes successful. The majority are successful under modern methods." In this view all the physicians concurred. Failure to effect a cure under such circumstances furnishes no evidence of want of care or skill. The patient suffered considerable pain, but this, as the evidence shows, may have been incident to the character of the injury.

*3. Negligence: evidence.*

The accident occurred on Wednesday, and Dr. Aiken did not call again until the Sunday following, and not again until a week from that day. If the injury required no attention during the intervals, he was not chargeable for neglect, if any there was; and in determining whether he was negligent Dr. Ross's custom in his own practice cannot be accepted as the criterion. That must necessarily depend upon the custom or practice in similar localities in the treatment of such injuries. But if Aiken was negligent in not attending his patient as frequently as he should, this was no fault of Trout. He had nothing to do with the case after the first dressing was applied, and was in no way responsible for anything that happened thereafter, unless resulting from some defect therein; and the jury should have been so instructed.

*4. Same.*

III. The dressing was put on at about 3 o'clock in the afternoon, and in the evening plaintiff's attendant tried to

reach Aiken, but could not do so, by telephone. She then telephoned for Dr. Trout, who responded that

**5. IMPROPER TREATMENT: evidence.** he could not come, and, upon a second inquiry, that he was in bed, and could not come. Without other showing save that Tomer was suffering much pain, which is usual in such cases, Dr. Ross was asked, in substance, whether, under the circumstances disclosed, it would be proper treatment for a doctor to refuse to attend a patient. There was no claim that any relapse or evil consequences resulted. Another physician in fact called and thinned the wad under the arm. The employment of Trout had terminated at the completion of the dressing. He had the perfect right to refuse to be employed farther, especially while the attending physician was still in charge of the case. Moreover, he was not advised that Aiken, who was at home, but temporarily without telephone connection, could not be found. As the case stood then, Aiken knew nothing of plaintiff's wish that he call, and did not learn of it until Sunday, the day he had set for his next visit; and Trout was not in plaintiff's employment, and was under no legal obligation to attend him. Manifestly, then, the objection to the question should have been sustained. That the answer, consisting of a somewhat extended discourse on medical ethics, was prejudicial, we entertain no doubt.

IV. If defendants were negligent, it was in the method of dressing adopted. This was described by Dr. Aiken as follows:

The end of the bone had been forced through the capsule. There was only the thin skin over the end of the bone; skin was almost broken through, and bleeding; had started

**6. IMPROPER TREATMENT: expert evidence.** through the skin. We examined it carefully, and the end of the bone seemed sharp. That was our first impression, but we made up our minds it was simply the cartilage pressing there. We reduced it. We prepared adhesive plasters, bandages, and compresses; elevated the shoulder upwards and outwards; reduced the dislocation; put a small firm compress over the

clavicle, just as near as we could to the injured skin; then took a wide strip of adhesive plaster, put it down across his chest, brought it over this pad, carried it to one side of the wound in the skin, brought the pressure on there to keep the clavicle down, then fastened it clear down his back. Then we put on five or six of those long strips, keeping the shoulder up and out during the time, put a roll of cotton under the armpit against the chest wall, keeping the arm up and carrying the shoulder outwards, and then we put a bandage around his body to hold his arm in that position; and put a broad sling under the elbow to keep the elbow up, hanging it across on the other side.

The testimony of Dr. Trout was substantially the same, and neither differed essentially from the description of plaintiff and Mrs. Childs. That was all the evidence that tended to show what the treatment was. Both physicians testified that the reduction was perfect. No change, save to move the roll under the arm a little, was made by Aiken when he called the first Sunday; but on the second Sunday, upon finding the plasters softening, and the skin irritated, he removed the bandages, and put a figure 8 bandage on instead. He testified: "The bone was not riding the scapula. It was down almost in place. I saw that, if I allowed the shoulder to drop, it would come out; but it did not come out, and when I brought the shoulders back it seemed to be smooth. The clavicle had been kept in position up to that time; had not rode any." And there was nothing in the record to throw any doubt on the truthfulness of these statements, save the testimony of plaintiff that there was then a small bunch on the shoulder, and the recognition by other physicians that, if this were true, there could not have been a perfect reduction. But for this evidence there would be much force in appellant's contention that the record failed to indicate that the treatment, regardless of its character, was not efficient. The fact that when Dr. Ross examined him the outer end of the clavicle was dislocated did not indicate that it had not been properly reduced, for, as he said, "if

the bandages are removed in ten days, they might as well never have been applied." Whatever the treatment, the articulation would not be sufficient in that time to hold the bones in place. And this seems to have been the consensus of the expert opinion. At the time of the trial the bone was an inch inward and backward from its bed, and had traveled one-half to three-fourths of an inch since Ross first examined it. But this would have followed plaintiff's abandonment of all treatment, regardless of its character. The next morning, on his own motion, plaintiff cut the figure 8 bandage from his person, owing, as he claimed, to the pain that he was suffering, and received no treatment thereafter.

The contention of plaintiff was that, while the dressing applied might have been such as had formerly been used, yet it was in fact inefficient, and that the Stimson method of dressing, discovered in 1883, should have been adopted. It was thus described by Dr. Ross: " The proper treatment of simple complete upward dislocation, as this is, of the collar bone, is first to reduce the dislocation. There are several different treatments, however, that might be accounted standard. Put the arm in proper position, and take a piece of adhesive plaster about a yard long, which sticks to the skin, and adjust over the shoulder and down under the elbow, so that it holds the arm up, and takes the dragging off the collar bone. Then put a bandage around to prevent his swinging his arm forward and dislocating it." He expressed the opinion that the method adopted originally and in the use of the figure 8 bandage had been standard until Stimson's treatment came in vogue, but were not now regarded as efficient, and that he had not noticed these treatments mentioned in the more recent works. In response to Trout's statement that Stimson's method would have been improper because of the clavicle being about to protrude through the skin, he admitted that the Stimson's method in exact words required the bandages to be brought over the point of the clavicle, but explained that he would have placed them at either side.

On the other hand, four physicians, besides the defendants, gave it as their opinion that it was wholly immaterial what method was adopted if the dressing was so placed as to retain the bones in a position by holding the shoulder up, out, and back, and that the methods adopted were generally approved. The value of expert opinion cannot be determined by counting noses, and, even though six physicians took one view and but one the other, the issue was for the jury to decide.—*Reversed.*