## KERNODLE v. ELDER.

No. 2133, Okla. T.   Opinion Filed May 12, 1909.

(102 Pac. 138.)

1.   PHYSICIANS AND SURGEONS—Action for Malpractice—Evidence. In an action against a physician for malpractice in the setting and treatment of a fractured limb, where there is no guaranty of cure or contract for extraordinary skill or care, and where the evidence fails to show that the results are not such as usually and ordinarily result in such cases where treated by an ordinarily skillful physician using ordinary care, then there is a failure of proof, and plaintiff is not entitled to recover.

2.   APPEAL AND ERROR—Reversal—Dismissal. Where in such a case it is apparent from the record that the claim of plaintiff cannot be sustained, on reversal the court will not remand for new trial, but will direct a dismissal.

(Syllabus by the Court.)

*Error from Probate Court, Logan County; J. C. Strang, Judge.*

Action by James B. Elder against J. D. Kernodle. Judgment for plaintiff, and defendant brought error to the Supreme Court of the territory. Case transferred to the Supreme Court of the state, and, on death of plaintiff, the action was revived in the name of Sarah M. Elder, administratrix. Remanded, with instructions.

*Cotteral & Hornor*, for plaintiff in error, cited: *Champion v. Keith* (Okla.) 87 Pac. 845; *Ewing v. Goode*, 78 Fed. 442; *Langford v. Jones*, 18 Ore. 207; *Tomer v Aiken* (Iowa) 101 N. W. 768; *Bigney v. Fisher* (R. I.) 59 Atlantic 72; *English v. Free* (Pa.) 55 Atlantic 777; *DeLong v. DeLaney* (Pa.) 55 Atlantic 965; *Pepke v. Grace Hospital* (Mich.) 90 N. W. 278; *Sterne v. Lang* (La.) 31 Southern 303; *Georgia Ry. Co. v. Ingram* (Ga.) 40 S. E. 708; *Mt. Adams Ry. Co. v. Laurie*, 78 Fed. 463; *Woodward v. Hancock*, 52 N. C. 384; *Williams v. Pappleton*, 3 Ore. 139; *Teft v. Wilcox*, 6 Kan. 46; *Pettigrew v. Lewis*, 46 Kan. 78; *State v. Housekeeper*, 70 Md. 171; *Jacksonville St. Ry. v. Chappell*, 21 Fla. 175; *Getchell v. Hill*, 21 Minn. 464; *Stevenson v. Gilsthorpe* (Mon.) 27 Pac. 404; *Wood v. Barker*, 41 Mich. 295; *Martin v. Courtney* (Minn.) 91 N. W. 487; *Willet v. Johnson* (Okla.). 76 Pac. 174.

*Lowry & Lowry*, for defendant in error.

DUNN, J.   This action was begun by James B. Elder filing his petition in the probate court of Logan county, territory of Oklahoma, on June 5, 1905, wherein he alleged that on or about the first of February, 1905, he fractured the bone of his right hip joint, and that the defendant, holding himself out as a physician and surgeon, and being in the general practice of medicine for hire in Logan county, was employed to set such fractured bone and to attend his said injury. The defendant was charged with having negligently and unskillfully diagnosed the difficulty, in that he dressed and bandaged plaintiff's limb as if the break were between the knee and the hip, and as though the fracture were in the vicinity of the knee, and that by reason of this error on his part the fracture itself was left wholly unattended and uncared for. That

this was careless, negligent, and unskillful on the part of defendant, and that by reason thereof plaintiff suffered great pain, and that the broken bone was knit together improperly in such a manner as to leave plaintiff crippled and lame, and to render him a permanent cripple for life. Damages were prayed for in the amount of $1,000. To this petition defendant answered by filing a general denial, and on the trial thereof before a jury a verdict for damages in the amount of $500 was returned. Judgment was rendered thereon, motion for new trial filed and overruled, and the cause was taken to the Supreme Court of the territory of Oklahoma by petition in error and case-made, and is now before us for our consideration by virtue of our succession to that court, under the terms of the Enabling Act and the Schedule to the Constitution. After the argument and submission of this cause, which stood on the docket of this court as J. D. Kernodle v. James B. Elder, the death of the defendant in error was suggested, and the action has been revived in the name of J. D. Kernodle against Sarah M. Elder, administratrix of the estate of James B. Elder, deceased.

A motion to dismiss was filed on the grounds that the case-made was not properly a part of the records of this court, and that the motion for new trial was overruled at the request of plaintiff in error, and also the petition in error was not filed within one year. This motion was overruled on the 25th day of June, 1907, by our predecessor, and the ruling will not be reviewed here.

Plaintiff in error relies upon one proposition to secure reversal, which is, "that the verdict and judgment are not sustained by sufficient evidence." To the issue thus raised, both parties have filed very full briefs, and the court has had the benefit of an able oral argument on the part of counsel, all of which have had our best attention and consideration. The record of the trial as presented here is unusually free of irrelevant or immaterial matter. The issues before the court and the jury was closely adhered to by counsel, and the instructions of the court are exceptionally lucid and comprehensive. All of these things tend to render it easier

for us to determine the precise proof in the case, and to ascertain and determine whether or not the verdict rendered was in fact legally sustained by the evidence.

Let us first notice the law governing the responsibility of physicians and surgeons in cases of this character. The general rule is quoted in volume 1 of Witthaus & Becker's Medical Jurisprudence, Forensic Medicine and Toxicology, at page 30, wherein the authors of this work adopt the rule as laid down in Shearman & Redfield's work on the Law of Negligence, pars. 433-435 (paragraphs 605-607, inclusive [4th Ed.] Shearman & Redfield on Negligence) :

"Although a physician or surgeon may doubtless by express contract undertake to perform a cure absolutely, the law will not imply such a contract from the mere employment of a physician. A physician is not an insurer of a cure, and is not to be tried for the result of his remedies. His only contract is to treat the case with reasonable diligence and skill. If more than this is expected, it must be expressly stipulated for. * * * The general rule, therefore, is that a medical man who attends for a fee is liable for such want of ordinary care, diligence, or skill on his part as leads to the injury of his patient. To render him liable, it is not enough that there has been a less degree of skill than some other medical man might have shown, or a less degree of care than even himself might have bestowed; nor is it enough that he himself acknowledged, some degree of want of care; there must have been a want of competent and ordinary result. * * * But a professed physician or surgeon is bound to use not only such skill as he has, but to have a reasonable degree of skill. The law will not countenance quackery; and, although the law does not require the most thorough education or the largest experience, it does require that an uneducated, ignorant man shall not, under the pretense of being a well-qualified physician, attempt recklessly and blindly to administer medicines or perform surgical operations."

The rule as adopted by the Supreme Court of Oklahoma Territory is announced in the case of *Champion v. Kieth,* 17 Okla. 204, 87 Pac. 845, wherein, on the authority of numerous cases cited, Mr. Justice Pancoast, in a well-considered opinion, says of the practicing physician :

"He is never considered as warranting a cure, unless under a special contract for that purpose. His contract, as implied by law, is that he possesses that reasonable degree of learning, skill, and experience which is ordinarily possessed by others of his profession; that he will use reasonable and ordinary care and diligence in the treatment of the case which he undertakes; and that he will use his best judgment in all cases of doubt as to the proper course of treatment. He is not responsible for damages for want of success, unless it is shown to be the result of want of ordinary skill and learning, such as ordinarily possessed by others of his profession, or for want of ordinary care and attention. He is not presumed to engage for extraordinary skill or for extraordinary diligence or care, nor can he be made responsible in damages for errors in judgment, or mere mistake in matters of reasonable doubt or uncertainty."

In order for plaintiff to recover in this case, it is absolutely essential that two conditions be shown to exist: First, it must appear from the evidence that the plaintiff sustained and suffered legal detriment or damage; and second, such detriment or damage may not be referable solely to the accident with which he met, but it must be shown on his part that considering the accident which he suffered, and his employment of a physician, still he is left in a condition worse than was his right to demand and expect, if his physician was ordinarily skillful and gave him the proper care. In the case at bar plaintiff complains of two things as constituting his detriment or damage: First, that his fractured limb was from an inch to an inch and one-half shorter than it had been; second, that the fractured and injured part was still painful, and that it was necessary, in order to use it, to call to his assistance a crutch or cane. Of course, if plaintiff's limb within a proper time had been restored in the treatment secured to a perfect limb, as it was prior to the time when broken, he could not recover from the physician who treated him, notwithstanding lack of skill shown or negligent care bestowed. So, in our judgment, it would follow if in the consensus of opinion of men schooled and learned in the science of surgery, well acquainted with the facts controlling and surrounding, and results attending, such an accident as this, the

limb, after treatment, if no unnecessary pain was occasioned or time consumed, was in as good a condition as an ordinarily skillfull physician, using ordinary care, could in the usual and expected course of events produce, then the plaintiff has failed to show that he has suffered such damage or detriment as the law will compensate him for; for while it may not be physically and actually perfect, it is in that condition in which limitations of human skill leaves a limb, fractured as it was.

This being true, the plaintiff has not suffered legal damage. He is not damaged. *Getchel v. Hill,* 21 Minn. 464; *Feeney v. Spalding,* 89 Me. 111, 35 Atl. 1027; *Stern v. Lanng,* 106 La. 738, 31 South. 303; *Hesse, v. Knippel,* Mich. N. P. (Brown) 109; *Tomer v. Aiken et al.,* 126 Iowa, 114, 101 N. W. 769; *Craig. v. Chambers et ux.,* 17 Ohio St. 254; *Ewing et al. v. Goode* (C. C.) 78 Fed. 442.

In the case last cited, *Ewing et al. v. Goode,* Taft, Circuit Judge, said:

"It is well settled that in such an employment the implied agreement of the physician or surgeon is that no injurious consequences shall result from want of proper skill, care, or diligence on his part in the execution of his employment. If there is no injury caused by lack of skill or care, then there is no breach of the physician's obligation, and there can be no recovery. *Craig v. Chambers,* 17 Ohio St. 253, 260. Mere lack of skill, or negligence, not causing injury, gives no right of action, and no right to recover even nominal damages. This was the exact point decided in the case just cited. In *Hancke v. Hooper,* 7 Car. & P. 81, Tindal, C. J., said: 'A surgeon is responsible for an injury done to a patient through the want of proper skill in his apprentice; but, in an action against him, the plaintiff must show that the injury was procured by such want of skill, and it is not to be inferred.' Before the plaintiff can recover, she must show by affirmative evidence: First, that defendant was unskilled or negligent; and, second, that his want of skill or care caused injury to the plaintiff. If either element is lacking in her proof, she has presented no case for the consideration of the jury. The naked facts that defendant performed operations upon her eye, and that pain followed, and that subsequently the eye was in such a bad condi-

tion that it had to be extracted, established neither the neglect and unskillfulness of the treatment, nor the causal connection between it and the unfortunate event. A physician is not a warrantor of cures. If the maxim, *'Res ipsa loquitur,'* were applicable to a case like this, and a failure to cure were held 'to be evidence, however, slight, of negligence on the part of the physician or surgeon, causing the bad result, few would be courageous enough to practice the healing art, for they would have to assume financial liability for nearly all the 'ills that flesh is heir to.' "

On this proposition the Supreme Court of Ohio, in the case of *Craig v. Chambers, supra,* held, in the syllabus, that:

"The implied liability of a surgeon, retained to treat a case professionally, extends no further, in the absence of a special agreement, than that he will indemnify his patient against any injurious consequences resulting from his want of the proper degree of skill, care, or diligence in the execution of his employment. And, in an action against the surgeon for malpractice, the plaintiff, if he shows no injury resulting from negligence, or want of due skill in the defendant, will not be entitled to recover nominal damages."

Should it be shown, however, by the evidence, that the limb which plaintiff had was not such a limb as a physician of ordinary skill and using ordinary care and diligence should have left him with, after treating it, then the burden is upon plaintiff, in order to sustain the verdict in this case, to show by the evidence that this result was brought about through lack of skill on the part of the physician, or through some wrongful or negligent act of omission or commission on his part. Neither of these conditions should be supported merely by theory, conjecture, or inference; but they should be based upon tangible, substantial evidence which the court and jury may grasp and understand. A physician employed in a case such as this, it should be remembered, as was said by Justice Upton (*William v. Poppleton,* 3 Or. 139) :

"* * * Is obliged by his calling constantly to enter the abode of others, and frequently to undertake difficult cases, and to perform critical operations in the presence of those who are ignorant and credulous. He is liable to have his acts misjudged, his motives suspected, and the truth colored or distorted even where there are

no dishonest intentions on the part of his accusers. And, from the very nature of his duty, he is constantly liable to be called upon to perform the most critical operations in the presence of persons united in interest and sympathy by the ties of family, where he may be the only witness in his own behalf. It is the intention of the law to protect the physician or surgeon as well as the patient. * * * A fracture or dislocation, or both combined, may be so complicated that no human skill can restore it. Or the patient may, by disregarding the surgeon's directions, impair the effect of the best-conceived measures. The surgeon does not deal with inanimate or insensate matter, like the stone mason or bricklayer, who can choose his materials and adjust them according to mathematical lines; but he has a suffering human being to treat, a nervous system to tranquilize, and an excited will to regulate and control. Where a surgeon undertakes to treat a fractured limb, he has not only to apply the known facts and theoretical knowledge of his science, but he may have to contend with very many powerful and hidden influences, such as want of vital force, habit of life, hereditary disease, the state of the climate. These or the mental state of his patient may often render the management of a surgical case difficult, doubtful, and dangerous, and may have greater influence in the result than all the surgeon may be able to accomplish, even with the best skill and care."

This being true, he should not be condemned except the evidence requires and justifies it.

With these observations and the law before us, we now turn to the evidence upon which the plaintiff relies for recovery, and find that it shows briefly the following facts: About four months prior to the filing of his petition in this case, plaintiff, who was a man of the age of 56 years and of fairly good health and activity, fell on the ice and fractured the femur bone of his right leg at or near the neck. He called in the defendant to treat him, and defendant arrived in about two hours after the accident, placed the plaintiff under the influence of chloroform, and made an examination. Plaintiff and a number of other witnesses, members of his family and neighbors, testified that the defendant informed him and them that the limb was fractured at a place above the knee between it and the upper part of the femur, perhaps about

the middle. It also appears that defendant applied what the physicions term a "Buck's extension," which consisted of, in this case, a splint in the shape of a board, attached to the limb on the under side, to which was fastened a rope which extended to a window frame, with a 5½ pound iron attached, for the purpose of tiring and extending the muscles to bring the broken parts of the bone in apposition. This occurred on the 1st day of February, 1905; the doctor remained with the plaintiff all of that night, and on the morning of the second day thereafter he returned, bringing with him what is commonly known as a "Hodgin splint," an appliance which he had made, consisting of an iron rod, bent much in the shape of a hairpin, the two sides laced together with webbing or cloth, and of about the length and shape of the leg. Into this the limb was placed with the foot near the loop, the open end being toward the body, the inside piece being about 10 inches shorter than the outside piece. This entire frame was then swung about two inches clear of the bed. allowing the limb to lie in this splint, which was attached to a pulley from the ceiling or window ledge by ropes or cords. That in this condition plaintiff remained in bed about three weeks, during which time he was waited upon by the physician. Plaintiff testified that his limb was left by this treatment in a weak or stiff condition in the hip, which interferred with its use, that it hurt him in walking, and he stated: "I cannot use it as well as I could before it was hurt; it is stiff, and the muscles won't expand;" also that he could not walk without the use of a cane or crutch. This is the proof of the damage on which he relies to recover. On his examination by his counsel, being requested to stand in his natural position with his back to the jury, he stated that the reason he did not put his right heel to the floor, upon being requested to do so, was that he could not. On being asked how far his heel was from the floor, he stated it was about two inches, whereupon his counsel stated, "It may feel that way, but I guess it is about an inch."

Plaintiff also stated that since the treatment by defendant he had applied to Messrs. Sharp and Stagner, local physicians, for

treatment. Dr. Stagner, one of those physicians, called by plaintiff, testified that he made an examination of his limb at his own and at Dr. Sharp's office, and was present when the same was examined with the X-ray. That the examination revealed an impacted fracture at the neck of the femur, the result of which he stated necessarily shortened the limb. He further testified that in a case of this character it was very likely that treatment would not produce the best results, and that the limb would be shorter than its normal length. That some of the authorities claim this shortening to be inevitable, as the bones of old persons do not knit as well as those of young people, and that the union is more likely to be fibrous. That he would not regard 81 per cent. of bad results as being much too high a per cent. in cases of this character.

Dr. Sharp, the other expert called on behalf of plaintiff on this proposition, testified as follows:

"Q. In treatment of fractures in the neck of the femur, how about shortening of the limb; is that a good result? A. In many cases it is. Q. Is it not a fact that there are eminent authorities who say that, in patients above 50 years of age, the shortening of the limb is inevitable? A. I think there are a number of authorities who make that statement."

The foregoing presents substantially all the evidence given by the experts called on the part of plaintiff upon the question of the shortening of the limb. From them it appears that the injured limb was from one inch to one inch and one-half shorter than the other, and from this evidence no other inference can be drawn than that this was as good a result as could be reasonably expected, considering the age and condition of the plaintiff. At all events, there is an absolute lack of any evidence showing that in cases of this character, under any kind of treatment, the limb is ever perfect afterwards or equals in length the uninjured limb. In this case the burden was not upon the defendant to show that plaintiff's limb was in as good a condition as medical science and skill could place it after its injury, but the burden was upon the plaintiff to show that it was not. This, in our judgment, he totally failed to do. The defendant, however, voluntarily assumed

the burden of showing that the results which were attained by the treatment were all that could have been expected under the conditions.

The plaintiff was able to get around on his limb by the use of a cane or a crutch. It was, as we have seen, from an inch to an inch and one-half shorter than the sound one. This condition was presented to a number of physicians called by the defendant, and they were interrogated upon the proposition as to whether or not such a result was practically all that medical science could promise. · We note a few of their answers to this question.

The defendant himself testified:

"Q. Would there likely be a perfect recovery in a fracture of that kind, Doctor, under any kind of treatment that medical science could give it? A. In a man of Mr. Elder's age, the latest statistics say there are absolutely none that are perfect. Q. In what way would there be any imperfection? A. There would be a shortening of the limb, and consequently a lameness."

He further stated that the statistics in cases of this character show that of young and old, taken together, 80 per cent. get a bad result.

Dr. Morse, who for 18 months was shown to have been on the house staff of surgeons in the Cook County Hospital, in Chicago, after he had graduated, testified to having had many cases of this character, and deposed as follows:

"A. It seems, so far as I know, it is an unknown thing in the profession to get a good result, and a good result is one in which there is no abnormal condition; it is practically never obtained in hip bone fractures. Q. What are the ordinary results? A. I should say that, after a period of six months or within a year the ordinary case, if not too feeble, will get out with crutches first, and then with a cane, and then they will be fortunate if they can get along either with or without a cane. Q. And are these the results that are expected and anticipated in the best hospitals? A. They are."

Dr. Morse further testified on this same subject as follows:

"A. Sometimes if they get a bony union and good apposition of the bones, particularly where they are strong, I mean where

Vol. 23—48

the patients are strong, they can get along with practically very little limp or without even a cane, but this is only in exceptional cases; the majority of them use the crutch or crutches for a period of months, and sometimes never get along without a crutch, and in some instances never get out of their wheel chair. Q. What about the shortening of the limb? A. The degree of shortening varies from three-fourths of an inch to two inches, with more or less tenderness remaining all their lives. Q. Then inability to get about without the use of a crutch or cane, a permanent shortening of the limb and a decided halt in their gait the remainder of their days, these are some of the results of a fracture of this kind? A. Yes, sir, they are among the most common results."

Dr. Reed testified as follows:

"Q. Have you had information and know, Doctor, either by observation, experience, study, or reading, the liability of shortening of the limb by a break in the neck of the femur? A. I have. Q. What is the likelihood or probability of that? A. We always expect to get shortening. Q. Under the most approved and proper methods of treatment? A. Yes, sir. Q. In a person as old as the plaintiff here, what about soreness in the parts? A. There would probably be tenderness for a long time. Q. What do you mean by a long time, Doctor? A. Several years. Q. What about the ability to get around after an injury of that kind and at his age? A. The results are never perfect in a man of that age; the period of getting about varies in different patients. I would consider, if he was ever able to use the limb in walking by putting his weight on it, that it would be as good or better than the average result."

Dr. Hill testified:

"Q. In fractures in the neck of the femur, what is the probability or likelihood of a shortening of the limb in a person as old as the plaintiff, here? A. It is practically inevitable, and it is expected in every case. Q. What about soreness, Doctor, and how long continued? A. That would depend upon the immobility of the joint, but ordinarily it would last a year or two; depends upon the amount of inflammation at the time of treatment."

Dr. Baker testified:

"Q. In a person of this age, Doctor, and his apparent condition, what would you say as to the probability of 'a shortening of the limb? A. I would say there would be a very remote possibility

of getting a result without shortening of the limb to some extent. Q. What about soreness in the parts, and what might you expect in that regard? A. He could expect trouble for the balance of his life in some way or other. If he didn't get union, he would have a limb that would be almost useless; if he got union, he might expect trouble in the way of soreness and things in that line, and the probability is he never would get entirely over it, so he would always have trouble. * * * Q. Why is it that there is such a large per cent. of bad results in the treatment of a fracture of this character? A. Well, in the first place, it is on account of the location of the injury; it is impossible to get the broken parts in apposition, and it is equally impossible to keep them there if you do get them; then a great many are mixed fractures, part intracapsular or extracapsular, difficult both of diagnosis and treatment; then in that location you may not get union at all on account of the intervention of muscles; the blood supply may be deficient, or a disease of the bone may develop and arrest the knitting process, especially in the aged; in fact, some physicians question the advisability of trying to get union at all under some conditions, because the patient will suffer less not to have union, although the leg may not be so useful; so it is the nature of the trouble and the location that causes so many bad results."

Dr. Melvin testified: ·

"Q. Now, under the best treatment that is known to medical science, what do you say as to the probability of a shortening of the limb from a fracture of the femur? A. It is very probable; indeed, I do not believe there would be more than five or ten out of a hundred that would not have shortening. Q. Suppose the fracture is in the neck of the femur, is the liability to shortening greater or less? A. It is more apt to have shortening if it is in the neck. Q. Is it always possible to get a union of the bone with a person as old as the plaintiff? A. No, sir. Q. What about soreness in the parts; what might be expected in that regard? A. Well, a great deal would depend upon the amount of lymph thrown out and the callous formation; it would naturally press on the nerves and cause a great deal of pain that might last for a number of years."

Dr. Ralph Smith testified to practically the same effect as the other physicians, and the testimony of them all, as is seen, supports the theory that the plaintiff, considering his age and the

character of the fracture, without reference to the character of treatment given him by his attending physician, had as good a limb as he had a right to expect or demand, and, in the absence of evidence showing that an ordinarly skilled physician, exercising ordinary diligence in his treatment, would or should have produced a different and a better result, then plaintiff cannot be said to be damaged or to be entitled to recover. There is no contention made on the part of plaintiff that defendant was not possessed of skill sufficient to entitle him to hold himself out and to treat cases of this character, unless this claim could be predicated upon the contention of plaintiff that defendant made an erroneous diagnosis, and that the adoption of the splint heretofore mentioned and the manner of its use was an indication of such a want of skill. The conclusion to which we have come relieves us of the necessity of minutely detailing the evidence bearing upon this question, for reasons we have heretofore stated; but we will say that there was no physician called on either side who, when asked, did not testify that the Hodgin splint was such an apparatus as was recognized by the profession as standard and was used generally for cases of this character, either for a break in the shaft, or in the neck of the femur, while many of the physicians testified that this splint was considered as one of the best apparatuses of its character known to the profession and was in use in the best hospitals. The defendant testified that the limb of plaintiff was attached to this frame, and that the extension was such that it was necessary to raise the foot off the bed in which plaintiff lay in order to relieve him of being pulled down into the bed by the force of the same. Plaintiff testified that his limb was not attached to the apparatus, or that, if it was, the attachment was removed, and that by reason of this his limb came out of the splint, and that it was necessary to replace it on occasions. Some of the physicians testified that it was a matter of judgment as to whether or not it was necessary to attach the limb to the splint, and as to whether or not, without being attached, there would be sufficient extension to overcome the contraction of the muscles; but the general net result, and only

rational conclusion to be drawn from the testimony of all the physicians is that plaintiff received treatment such as was recognized to be proper, and that the result was practically all that could be looked for.

There is no other higher or better method known to our law or practice to determine disputed questions of fact than by the verdict of 12 jurors. Where a cause of action is shown to exist, and they are permitted to hear all the relevant, competent, and material evidence offered, and the instructions of the court are proper, a verdict reasonably supported by such evidence is not to be lightly regarded or set aside by an appellate tribunal. These observations are fundamental, but there are no classes of cases, perhaps, which go to juries, or, indeed, with which lawyers and courts are called upon to deal, where results are so uncertain and so frequently unsatisfactory as cases involving damages against physicians for alleged malpractice in their efforts to alleviate the ills to which the human flesh is heir. It is nearly always the defendant's judgment which is on trial; and on the hearing the jury and the parties are all sitting and speaking after the fact, while the unfortunate physician when he acted was perhaps required by the conditions to grope, deliberate, and often speedily act, and always before the fact. After he has acted and the results are different than he desired or expected, and different than were expected or desired by the patient, if a suit is brought, the physician is confronted with all of the after-acquired knowledge, and his responsibility is weighed from that standpoint rather than from the true one. A preponderance of the evidence in cases of this character is sufficient to sustain a plaintiff's cause. No more should be required, and no more is required; but it should be certain on the part of the court and jury that they are acting from actual evidence before them, properly referable to the cause, and that the judgment, when against the physician, is based upon such evidence, and not upon bias, conjecture, or inference.

In keeping with these general observations, attention is called

to the language used by Chief Justice Thayer in the case of *Langford v. Jones,* 18 Or. 307-323, 22 Pac. 1064, 1070:

"The practice of leaving the jury to determine such cases has been permitted often, when the responsibility was really upon the court. It is wrong and unjust to the medical profession to pursue such a course; it tends to encourage the institution of suits against its members when no grounds exist therefor. A physician, in the treatment of disease, or in the performance of surgical operations, does not always achieve that success he desires. Circumstances often intervene over which he has no control, and render his treatment unsatisfactory. This is more specially so with surgery. It frequently happens, in the reduction of a fracture or dislocation, that from some cause, for which the surgeon was in no wise responsible, the parts of the broken bone have not properly united, have been found not to be in perfect apposition, or the dislocated joint to be enlarged, or that muscular action of the limb has become suspended, or the limb become crooked; and sometimes, in consequence of important nerves having been severed at the time of the fracture, a loss of sensation of the parts is occasioned, resulting in a permanent numbness, and amputation becomes necessary. In a majority of such cases the party injured by the casualty will claim damages against the surgeon who attended upon him, and have no difficulty in having an action instituted to enforce it, predicating his cause upon alleged negligence in the reduction of the fracture or dislocation, or of insufficient support to the broken parts, or of too tight bandaging, or upon some other pretext, but relying mainly upon the deformity of the limb as the ground for a recovery; and generally, through the sympathy, prejudice, or stupidity of a jury, succeeded in mulcting the defendant in damages. * * * The average juror knows very little about such matters. If he has sufficient discretion to understand them in the outset, he will lose it by the time he has heard the expert testimony and the summing up of the counsel. A trial court should never allow a case of malpractice to be submitted to a jury unless the plaintiff has fairly shown, by competent proof, that the defendant is guilty of the charge alleged against him."

In the concluding remarks of the court in that case, it said:

"The judgment appealed from will be reversed. Ordinarily such a disposition of a case is followed by an order remanding it to the court below for a new trial; but, under the peculiar circumstances existing in this case, such order will not be made. It

will be remanded, however, with directions to dismiss the complaint."

In the case of *Ewing et al. v. Goode, supra,* Judge Taft said:

"The condition of the plaintiff cannot but awaken the sympathy of every one, but I must hold that there is no evidence before the court legally sufficient to support a verdict in her favor. I should deem it my duty without hesitation to set aside a verdict for the plaintiff in this case as often as it could be rendered, and, that being true, it becomes my duty to direct a verdict for the defendant."

In the case at bar, with all of the evidence before us on which plaintiff could possibly predicate the hope of recovery, and there being a total want and absence of the necessary elements to entitle him to recover, the cause is accordingly remanded to the county court of Logan county with instructions to dismiss the same.

All the Justices concur.