## MAYBERRY v. MYERS et al.

No. 13774—Opinion Filed Oct. 7, 1924.

1. **Appeal and Error—Review—Sufficiency of Evidence—Verdict in Action for Damages for Negligent Operation.**

In law actions, sought to be reversed upon the sole ground that the evidence was insufficient to support the verdict, the general rule is that the judgment will be affirmed where there is any evidence reasonably tending to support the verdict; and the fact that the action is for damages for negligence on the part of a surgeon for failure to remove a gauze sponge from the abdominal cavity after performing a surgical operation, and before closing the incision, where the operation was performed by the surgeon in his own hospital and surrounded by nurses in his employ and associate physicians, creates no exception.

2. **Same—Verdict for Plaintiff Sustained.**

The evidence reasonably tends to support the verdict.

(Syllabus by Ray, C.)

Commissioners' Opinion, Division No. 1.

Error from District Court, Noble County; C. C. Smith, Judge.

Action by Pearl M. Myers against Dr. Sylvester N. Mayberry, S. H. Gaines, and E. J. Swank. Judgment against Dr. Sylvester N. Mayberry only, who appeals. Affirmed.

Everest, Vaught & Brewer (W. M. Bowles, of counsel), for plaintiff in error.

Johnston & Paddock, for defendants in error.

Opinion by RAY, C. Pearl M. Myers commenced this action against Dr. Sylvester N. Mayberry, Dr. E. J. Swank, and Dr. S. H. Gaines, for damages alleged to have been suffered by the negligence of the defendants in leaving a gauze, known as a surgical sponge, in the abdominal cavity at the time a surgical operation was performed upon the plaintiff. The verdict was against Dr. Sylvester N. Mayberry, alone, in the sum of $3,000, upon which judgment was entered and from which Dr. Mayberry appeals.

With the record free of errors of law, we are asked to review the evidence and say that the verdict was not sustained by sufficient evidence upon the grounds, first, that the plaintiff alleged and sought to prove a thing not only improbable but impossible of occurrence, and, second, that a proper degree of care was exercised. The operation was performed at the University Hospital at Enid, conceded to be one of the most modern and best equipped hospitals in the state. The ability and skill of Dr. Mayberry as a surgeon is likewise conceded. No question is raised as to the skillfulness of the operation. The case having been tried by a jury upon conflicting evidence, that is, conflicting inferences arising from the testimony of the witnesses, it might be disposed of in a few words by the adoption of the rule of this court that in such cases the evidence will not be weighed to determine upon which side the preponderance lies, but as counsel so earnestly insist that in this class of cases this court has, perhaps unconsciously, adopted a different rule, we will review the evidence and the authorities cited upon which this contention is based. There is but little conflict of evidence as to any particular fact. It is a strange story supported by plaintiff's evidence which, if true, proves an occurrence which plaintiff in error contends is an impossibility.

Pearl Myers was of sound health until she was some 14 or 15 years old when she engaged in a cotton picking contest, when she injured herself by overloading a cotton sack which she carried, or dragged, behind her. Thereafter for a period of 4 or 5 years she was under the care and observation of Dr. S. H. Gaines, the family doctor. He finally diagnosed the case as appendicitis and recommended an immediate operation. Upon his recommendation she was taken to Dr. Mayberry's hospital in Enid and an operation performed by him in which the appendix, about three-fourths of the right ovary and one fallopian tube were removed. After being kept in the hospital about two weeks she was taken home some distance in the country. She did not recover from the operation as was expected but continued to have pains in her back and in the region of the operation. She was taken back to the hospital on two occasions to be examined by Dr. Mayberry, first, about six or eight weeks after the operation, and the second time about four months after the operation. For something over a year after the operation was performed she continued to suffer and fell away in flesh. Sometimes she was up and sometimes she was in bed. Dr. Gaines was called to see her once or twice a month but was unable to determine the cause of the continued trouble. Occasionally he gave opiates to relieve the pain and was continually giving medicines to cause proper movement of the bowels. He gave her a great amount of castor oil and olive oil. His testimony was that he had probably given one or two gallons of olive oil. In April, 1920, a little more than a year after the operation had been performed, when her bowels had not moved for three or four days, her testimony is that she went into the toilet to see if her bowels would move and found something protruding from her and became frightened and thought her bowels were coming out. She took hold of it and after two or three efforts pulled it out and discovered that it was a cloth of some kind. She called her sister who was in the house. The sister went to the toilet and Pearl pointed out what had just passed from her. The sister helped her back in the house and then returned and took the cloth in a paper and started to the house with it and met her father and told him of the occurrence. He put the cloth in a box and set it on the back porch and called Dr. Gaines. He immediately came. When Dr. Gaines arrived he "found the patient excited." "didn't see any material difference in the girl." "She was sitting up in the place of lying down." "She thought she was going to die, she said." The girl's father then invited the doctor out in the yard to show him what was there. He recognized it immediately as a sponge used in operations. He became anxious for the girl's welfare. It was a new thing to him. He couldn't understand how the sponge could have passed through the bowels without leaving an opening that would cause immediate death. He advised going back to the hospital the next day for examination, but Pearl insisted upon going

at once. When they arrived at the hospital Dr. Gaines, without disclosing his reason therefor, asked that X-ray pictures be taken. Dr. Swank, Dr. Mayberry's first assistant, and who was his assistant at the time of the operation, took two pictures, neither of which showed anything out of the ordinary. Then Dr. Gaines told him of the circumstance and indicated his belief that the gauze had been left in the abdominal cavity at the time of the operation. Dr. Swank then took a number of other pictures which likewise failed to show any rupture or other trouble with the bowels. The pictures were not offered in evidence. She later returned, on two occasions, to the hospital for examination. Dr. Gaines kept the sponge in his possession from the time he first received it, and it was offered in evidence by the defendants. He testified that it was in the same condition at the time of trial as when he first saw it except that when he first saw it it was moist and apparently had the matter expelled from the bowels on it.

Counsel say that the case rests upon the uncorroborated testimony of Pearl Myers that the sponge passed from her bowels. With this we cannot agree. There is the testimony of her sister, who was called immediately after the occurrence, who said that it was moist and had a strong odor, and the testimony of her mother who testified that it smelled like the passage from the bowels of a person sick of a fever, and the testimony of Dr. Gaines that it was moist and "apparently had the matter expelled from the bowels on it." We think from this evidence the jury were justified in finding that the sponge offered by the defendant in evidence passed through the bowels of the plaintiff. It is next contended that upon the testimony of expert witnesses it was impossible for the sponge to have passed through the wall of the ascending colon and to have passed through the colon. Dr. A. L. Blesh, who had performed and observed something like 10,000 surgical operations, was unwilling to say that anything was impossible. It was possible for the gauze to ulcerate through in the bowels but considered it highly improbable. He had never observed a case of that kind. The only thing that he had ever known to ulcerate through into the bowels and pass out at the rectum was the bones of a fetus, but he did not believe it to be possible for the sponge to pass through without clogging the bowels which would cause death unless it was removed by a surgical operation. He had removed ten or twelve sponges that had been left in

the abdominal cavity. Dr. W. A. Aitken was of the opinion that it would be hardly possible for the reason that all foreign bodies have a tendency to remain where they are put; that he had never known of a case where a surgical sponge passed from the abdominal cavity through the intestines. Dr. D. F. Coldiron, in response to a hypothetical question by counsel for defendant, in which he was asked his opinion as to whether the sponge could pass through as indicated, said, "It might do it but I don't see how it could." Dr. E. J. Swank, one of the defendants, was of the opinion that it was impossible for it to pass through in the way indicated. But one significant fact that no doubt impressed the jury was that plaintiff began to improve immediately after passing the sponge and at the time of the trial was apparently in good health.

It is very probable that the jury did not rely upon the testimony of Dr. Mayberry as being wholly accurate when he testified that no sponges were used in performing the operation. Counsel for defendant, in his opening statement to the jury, explained to the jury the use of sponges in performing surgical operations; that all the sponges were counted when brought in the room and counted again after the operation was over to make certain that none had been left in the wound, and that after they had counted to ascertain that no sponge was left in the wound, Dr. Mayberry had then explored the incision with the hand and searched particularly for any sponge that might have been left. The first witness was Dr. Blesh, who explained to the jury how an operation of this kind should be performed, and the method used by modern surgeons to make sure that no sponge was left in the abdomen, and explained that sponges were used "for two purposes: the first purpose is to sponge the blood from the field of operation to enable the operator to find his point with precision, the second purpose is to wall the intestines away from the immediate field of operation." He explained what was meant by a dry operation for appendicitis in this language: "A dry operation is one in which there is very little, if any, blood, or it may be done upon an appendix which contains no pus or about which there are no abscesses." Dr. Mayberry explained how the operation was performed. The appendix is described as a "chronic appendix," "a stone in it about the size of a bean was removed." The right ovary was found to be cystic, three or four times as large as it ought to be and about three-fourths of it was removed. The tube leading from the

ovary to the uterus was found to be closed and it was removed. He then closed the abdomen. He then testified that in case of a simple appendix without any pus he never used any sponges; that it had been a practice of his for years never to use a sponge in case of appendicitis, and, when asked by counsel if he used any sponges inside of the cavity, answered, "I certainly did not." He then went into detail as to the duties of the various nurses, how the sponges were counted in by the sterile nurse under his observation and supervision, and how they were checked up by recount, and before the incision was closed, how he explored with his fingers to be sure that no sponge was left. The nurse who administered the anesthetic said there was no sponge used except to remove the blood from the surface. Another nurse, referred to as the "roust nurse," whose duty it was to remove the sponges after being used, said that she saw the entire operation except when somebody would pass between her and the operating table, and that no sponges were placed inside the cavity, but that he "put them on forceps to reach down in there with." Dr. Swank, assistant in the operation, was not asked whether any sponges were used. Dr. Gaines, who was the Myers' family physician and had brought Pearl to the hospital for the operation, did not remember whether any sponges were used or not. Pearl's father, who was in the room, and the only person other than the doctors and the nurses, did not see any sponges placed in the cavity. All the doctors and nurses told of the care with which sponges were counted in for use, and counted out after use; that Dr. Mayberry, after being sure that they were all counted out, as an additional precaution, explored the cavity to see that none were left. There were two things unexplained which probably had a tendency to give the testimony of Dr. Mayberry, and that of the other witnesses who said no sponges were used, less weight than they might otherwise have done, and may have caused them to believe that Dr. Mayberry did not have as great a faith in the theory advanced by the defendant that it was impossible for the sponge to ulcerate through the intestinal walls and to pass through the colon and out at the rectum, as his testimony otherwise would indicate. There was no explanation as to how the removal of the appendix, one ovary and a fallopian tube could be considered a simple appendix operation, nor why the intestines were not walled off from the field of operation as Dr. Blesh had testified was proper in performing a simple appendix operation.

Dr. Blesh, of conceded skill and ability as a surgeon of wide experience, was the first witness placed upon the stand by defendant for the purpose of showing the value of gauze sponges and the approved methods of modern surgery in their use in surgical operations, and the method of accounting for them after the operation to avoid leaving them in the cavity. Dr. Mayberry was likewise conceded to be a capable surgeon of wide experience, and when he answered, "I certainly did not," when he had been asked if he used any sponges in the opening, after Dr. Blesh had testified that they were used in modern surgery to wall off the intestines from the immediate field of operation even in a simple appendicitis operation, without any explanation as to how the field of operation was kept clear, or why the removal of an ovary and fallopian tube did not complicate the operation and render it more than a simple appendix operation, the jury may not have felt justified in giving full weight to his testimony that the sponges were carefully counted in and out and that he had explored the opening to be sure that no sponge was left. Miss Shermot, called the sterile nurse, whose duty it was to count in the sponges, and who did count them in, was not a witness, but her absence was accounted for by showing that she was in Louisiana. It may be observed that the only persons who were in the room at the time the operation was performed, with the exception of plaintiff's father, were the doctors, defendants in this case, and the nurses, all of whom were employes of Dr. Mayberry.

We think the case was properly submitted to the jury and we are unable to say that they reached an incorrect conclusion. It is contended that the rule laid down in Cassingham v. Berry, 67 Okla. 134, 150 Pac. 139, should be applied. In that case it was held that an instruction to the effect that although the jury might believe from the evidence that the sponge was inadvertently left in the abdominal cavity, still if they believed that the surgeon, in performing the operation, exercised ordinary care in keeping track of the sponges, and in seeing that they were all removed before the incision was closed, their verdict should be for the defendant, was a correct statement of the law and properly given. To that contention we think it sufficient to say that the instruction approved in the Cassingham Case was given in this case, and no complaint is made of the instructions. Champion v. Keith, 17 Okla. 204, 87 Pac. 845, and Kernodle v. Elder, 23 Okla. 743, 102

Pac. 138, were suits for negligence and want of skill in treatment of injuries. Here the suit rests upon negligence in failing to remove a sponge after the operation was performed. No question is raised as to the skillfulness of the surgeon. Counsel for Dr. Mayberry, after quoting at length from the above cited cases, and from Ewing v. Good, 78 Fed. 442, and recognizing the general rule of this court that, in law actions, the evidence will not be weighed to determine whether a correct conclusion has been reached, say, "But this court has shown a fairness and insight in cases of this character, which has led it to create perhaps almost unconsciously, an exception to the rule." The reason for that exception is stated in Kernodle v. Elder, as follows:

"* * * A physician employed in a case such as this, it should be remembered, as was said by Justice Upton (Williams v. Poppleton, 3 Or. 139), 'is obliged by his calling constantly to enter the abode of others, and frequently to undertake difficult cases, and to perform critical operations in the presence of those who are ignorant and credulous. He is liable to have his acts misjudged, his motives suspected, and the truth colored or distorted even where there are no dishonest intentions on the part of his accusers. And, from the very nature of his duty, he is constantly liable to be called upon to perform the most critical operations in the presence of persons united in interest and sympathy by the ties of family, where he may be the only witness in his own behalf. It is the intention of the law to protect the physician or surgeon as well as the patient'."

While we heartily approve of the statement that it is the intention of the law to protect the physician or surgeon as well as the patient, it may, with equal soundness, be said that it is the intention of the law to protect the patient as well as the surgeon. The conditions there pointed out as the reason for making such cases an apparent exception to the general rule are wholly different from the circumstances of this case. Here the operation was performed in the defendant's own hospital where he was surrounded by associate physicians and his own employes. There is no occasion here for such exception.

The judgment should be affirmed.

By the Court: It is so ordered.